MADISON TEACHERS, INC., Plaintiff-Respondent,

v.

MADISON METROPOLITAN SCHOOL DISTRICT, Defendant-Appellant.

Court of Appeals

*No. 93–3323. Oral argument November 18, 1994.—Decided October 19, 1995.*

(Also reported in 541 N.W.2d 786.)

736

For the defendant-appellant the cause was submitted on the brief of *Michael J. Lawton, Malina R. Piontek* and *Frank C. Sutherland* of *Lathrop & Clark* of Madison and *Clarence L. Sherrod*, Legal Counsel, *Madison Metropolitan School District* of Madison. Oral argument by *Michael J. Lawton*.

For the plaintiff-respondent the cause was submitted on the brief of *Lee Cullen* and *Cynthia A. Curtes* of *Cullen, Weston, Pines & Bach* of Madison. Oral argument by *Lester Pines*.

For the Wisconsin Employment Relations Commission an amicus brief was submitted by *Burneatta L. Bridge*, deputy attorney general, with *David C. Rice*, assistant attorney general.

For the Wisconsin Education Association Council an amicus brief was submitted by *William Haus* of *Kelly and Haus* of Madison.

For the Wisconsin Association of School Boards, Inc. an amicus brief was submitted by *Michael J. Spector* and *Carmella A. Huser* of *Quarles & Brady* of Madison.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

GARTZKE, P.J. Madison Metropolitan School District (the district) appeals from a judgment ordering the district and Madison Teachers, Inc. (MTI) to proceed with the mediation/arbitration process of § 111.70(4)(cm)6, STATS. The district is a municipal employer within the meaning of § 111.70, part of the Municipal Employment Relations Act (MERA), subch. IV of ch. 111, STATS. MTI represents teachers and other employees of the district for purposes of collective bargaining.

## I. ISSUES

The issues presented are: (1) whether the doctrine of primary jurisdiction requires the Wisconsin Employment Relations Commission (WERC), and not the trial court, to first interpret and apply § 111.70(4)(cm)5s, STATS.; (2) whether a collective bargaining unit which includes "school district professional employes" as well as other employees (a "mixed unit") is subject to the qualified economic offer (QEO) provisions of § 111.70(4)(cm)5s; (3) whether (a) the district engaged

in a prohibited practice when it pursued a unit-clarification petition with WERC, (b) the trial court therefore properly enjoined the district from pursuing the petition and (c) the doctrines of exclusive jurisdiction or primary jurisdiction prevent the trial court from issuing such an injunction; (4) whether, as asserted by a non-party, a determination that § 111.70(4)(cm)5s does not apply to mixed units creates (a) absurd results, (b) contravenes the purpose of the amendments or (c) adversely affects the constitutionally required uniformity among school districts, thereby violating public policy.

We conclude that the trial court: (1) properly retained jurisdiction, notwithstanding the primary jurisdiction doctrine, to interpret and apply § 111.70(4)(cm)5s, STATS.; (2) correctly held that mixed units are not subject to § 111.70(4)(cm)5s; (3) correctly exercised its discretion when enjoining the district from pursuing its unit-clarification petition on its alternative rationale of preventing inequity and that the doctrines of exclusive jurisdiction and primary jurisdiction do not bar the injunction. We reject the non-party's arguments.

We therefore affirm the judgment.

## II. BACKGROUND

MTI's bargaining unit consists of about 2062 teachers who are required by the district to be licensed by the Wisconsin Department of Public Instruction (DPI) under § 115.28(7), STATS. The unit also consists of 308 employees who are not licensed under § 115.28(7).[1] The latter group includes school nurses, a paraprofes-

---

[1] A school district that engages the services of at least one employee is a municipal employer. Section 111.70(1)(j), STATS.

sional employee, "other related professionals," and nonfaculty personnel including athletic directors, coaches and advisors.

In May 1993, the district and MTI began to negotiate the terms of a successor collective bargaining agreement to the one set to expire on October 13, 1993. When bargaining began, MERA § 111.70, STATS., 1991-92, governed the process. That law provided in part that either party could petition WERC to initiate "interest arbitration" on all disputed issues concerning wages, hours and conditions of employment. Section 111.70(4)(cm), 1991-92. An arbitrator chose between the last best offers submitted by each side, and his decision was final and binding on the parties. *Id.*

During the bargaining between the district and MTI, the legislature amended MERA by creating § 111.70(4)(cm)5s, STATS., 1993 Wis. Act 16, § 2207ak, which provides in relevant part:

> In a collective bargaining unit *consisting* of school district professional employes, if the municipal employer submits a qualified economic offer applicable to any period beginning on or after July 1, 1993, no economic issues are subject to interest arbitration under subd. 6 for that period. (Emphasis added.)

That and the other amendments to § 111.70 in 1993 Wis. Act 16 took effect on August 12, 1993.[2] 1993 Wis. Act 16, § 9320.

---

[2] A "**collective bargaining unit**" is "a unit consisting of municipal employes who are school district professional employes or of municipal employes who are not school district professional employes that is determined by the commission to be appropriate for the purpose of collective bargaining." Section 111.70(1)(b), STATS., 1993 Wis. Act 16, § 2207ah.

In October 1993, the district submitted to WERC a petition for interest arbitration of noneconomic issues, the district's preliminary final offer on those issues and its QEO on the economic issues still in dispute. The district claimed that newly enacted § 111.70(4)(cm)5s, STATS., applied.

MTI then brought this action under § 806.04, STATS., for a judgment declaring that § 111.70(4)(cm)5s, STATS., does not apply to bargaining the successor agreement with the district. MTI contends that because the bargaining unit includes employees who are not school district professional employees, as defined in new § 111.70(1)(ne), the unit does not consist of school district professional employes, and therefore § 111.70(4)(cm)5s, does not apply. Hence, MTI contends, binding arbitration is required for all disputed issues, economic and noneconomic, under § 111.70(4)(cm)6.

---

A "**school district professional employe**" is "a municipal employe who is employed by a school district, who holds a license issued by the state superintendent of public instruction under s. 115.28(7), and whose employment requires that license." Section 111.70(1)(ne), STATS., 1993 Wis. Act 16, § 2207ai.

A "**qualified economic offer**" (QEO) generally permits municipal employers to maintain their percentage contribution to municipal employees' existing fringe benefit costs and to limit salary increases for each 12-month period covered by the collective bargaining agreement to 2.1% of the total compensation and fringe benefit costs for all municipal employees in the collective bargaining unit. Section 111.70(1)(nc), STATS., 1993 Wis. Act 16, § 2207aho.

An "**economic issue**" is any issue "that creates a new or increased financial liability upon the municipal employer," including salaries and other benefits. Section 111.70(1)(dm), STATS., 1993 Wis. Act 16, § 2207ahm.

In response, the district petitioned WERC for a declaratory ruling under § 227.41, STATS., that MTI is indeed a collective bargaining unit "consisting of municipal employes who are school district professional employes," and that therefore the district is not subject to compulsory, binding interest arbitration on disputed economic issues. The same day the district petitioned WERC under § 111.70(4)(d), STATS., for "unit clarification," requesting that WERC divide the MTI bargaining unit into two units, one consisting of school district professional employees and the other consisting of the remaining employees. That would allow the district to submit a QEO, and avoid compulsory arbitration on economic issues, for the unit consisting solely of school district professional employees.

MTI responded in turn by asking the circuit court that until it determined whether § 111.70(4)(cm)5s, STATS., applied, the court enjoin the district from using the QEO provisions, asserting in any forum that its economic proposal is not subject to binding interest arbitration, and acting to implement its final offer in collective bargaining. The court issued the injunction.

MTI later amended its complaint to request an additional declaration that the district's unit-clarification petition to WERC breached the collective bargaining agreement still in effect between the parties. MTI requested an injunction to prevent the district from pursuing its unit-clarification petition.

The circuit court concluded that it had jurisdiction to grant relief under §§ 806.04 and 111.07(1), STATS. The court declared that because the MTI bargaining unit includes employees who are not "school district professional employes," § 111.70(4)(cm)5s, STATS., does not apply to MTI, making it inapplicable to the negotiation of a successor agreement. The court further

declared that any dispute regarding the terms of the successor bargaining agreement, including its economic terms, is subject to final and binding interest arbitration under § 111.70(4)(cm)6. The judgment enjoins the district from any action inconsistent with the foregoing and from proceeding with its petition for unit clarification. The court concluded that the agreement, set to expire October 13, 1993, remains in effect,[3] and was not breached by the district's petition for unit clarification. Lastly, the court directed the parties to proceed with the mediation/arbitration process of § 111.70(4)(cm)6 and engage in binding arbitration if they do not reach voluntary settlement.

The district appealed.

### III. PRIMARY JURISDICTION DOCTRINE

The circuit courts and WERC are empowered to interpret MERA by way of declaratory relief. Under the Uniform Declaratory Judgments Act, § 806.04(1) and (2), STATS., a circuit court can declare rights, status and other legal relations as affected by a statute once it has determined its meaning. Section 227.41, STATS., authorizes administrative agencies to issue declaratory rulings "with respect to the applicability to any person, . . . or state of facts of any . . . statute enforced by it."

When both a circuit court and an administrative agency have power to resolve a dispute, the question is which forum has primary jurisdiction. *Brookfield v. Milwaukee Sewerage Dist.*, 171 Wis. 2d 400, 420, 491 N.W.2d 484, 491 (1992). Here the circuit court retained jurisdiction, because it concluded that WERC had no special expertise to deal with the principal issue, the

---

[3] The agreement contained a contract continuation clause.

meaning of the phrase "consisting of municipal employes who are school district employes" in § 111.70(4)(cm)5s, STATS.[4]

The district asserts that the court should have deferred to WERC for the construction and application of the newly enacted statutory provisions.[5] We disagree.[6]

The purpose of the primary jurisdiction doctrine is to promote the proper relationship between administrative agencies and the courts. *Brookfield*, 171 Wis. 2d at 420, 491 N.W.2d at 491. The circuit court has discretion whether to retain jurisdiction.[7] *Id*. The issue

---

[4] In Part V, we discuss the separate issue whether the circuit court properly exercised its jurisdiction when it enjoined the district from pursuing its clarification petition during negotiations.

[5] The district argues that (1) because the commission is specifically charged with the duty of administering MERA, § 111.70(4)(d), STATS., it is uniquely qualified to provide uniform and consistent application of MERA, (2) because it had adjudicated many cases under MERA prior to amendment, it is "uniquely qualified to examine issues arising from the integration of [the amendments] with MERA's statutory scheme," (3) as part of its statutory obligations under the amendments, it has developed emergency rules which address the administration of the QEO provisions, and (4) the court gave no meaningful reason for exercising its jurisdiction and failed to engage in a reasoned consideration of primary jurisdiction.

[6] WERC argues in its non-party brief that it has exclusive authority to determine the appropriate bargaining units under MERA. We discuss that issue in Part V, *infra*.

[7] Because the circuit courts have plenary jurisdiction over all matters by virtue of the Wisconsin Constitution, *Mueller v. Brunn*, 105 Wis. 2d 171, 176, 313 N.W.2d 790, 792 (1982), the precise issue is whether the court was competent to proceed. *Id*.

before us is whether the court properly exercised that discretion. *Id.*

The issues best left to administrative agencies differ from those best resolved by the courts:

> [W]hen factual issues are significant, the better course may be for the court to decline jurisdiction; when statutory interpretation or issues of law are significant, the court may properly choose in its discretion to entertain the proceedings. We have cautioned the circuit court to exercise its discretion with the understanding that the legislature created the agency in order to afford a systematic method of fact finding and policymaking and that the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention.
>
> Administrative agencies are designed to provide uniformity and consistency in the fields of their specialized knowledge. When an issue falls squarely in the very area for which the agency was created, it is sensible to require prior administrative recourse before a court decides the issue.

*Brookfield*, 171 Wis. 2d at 421, 491 N.W.2d at 492.

The record does not disclose whether the circuit court considered the factors outlined by the *Brookfield* court when proceeding to construe the new legislation. We therefore independently review the record to determine whether it provides a basis for the court's decision. *State v. Pharr*, 115 Wis. 2d 334, 343, 340 N.W.2d 498, 502 (1983). We are satisfied that the circuit court did not erroneously exercise its discretion.

█

The controlling issue before the circuit court was the meaning of a new statute. The commission has

at 177, 313 N.W.2d at 793. However, because the parties discuss the issue in terms of jurisdiction, so do we.

746

never before interpreted it and is no better equipped than the circuit court to determine its meaning, a question purely of law. No factual issues exist, and no pertinent issue requires WERC's specialized knowledge.

■

Moreover, in addition to seeking a declaratory judgment, MTI sought injunctive relief. Section 111.07(1), STATS., by providing that "nothing herein shall prevent the pursuit of legal or equitable relief in courts of competent jurisdiction," recognizes a circuit court's authority to grant equitable relief in matters concerning MERA. An injunction is equitable relief. WERC cannot provide it. *Local 913 v. Manitowoc County*, 140 Wis. 2d 476, 485, 410 N.W.2d 641, 645-46 (Ct. App. 1987). Only a court may grant an injunction.

We conclude that the circuit court properly retained jurisdiction.

### IV. MEANING OF DISPOSITIVE PHRASE IN § 111.70(4)(cm)5s, STATS.

The district disputes the circuit court's conclusion that the phrase in § 111.70(4)(cm)5s, STATS.—"consisting of school district professional employes"—is unambiguous and means consisting exclusively of such employees.

■

We review *de novo* a circuit court's interpretation of a statute. *State v. Phillips*, 172 Wis. 2d 391, 394, 493 N.W.2d 238, 240 (Ct. App. 1992).

> The aim of all statutory interpretation is to discern the intent of the legislature. In ascertaining that intent, the first resort is to the language of the statute itself. If it clearly and unambiguously sets forth

the legislative intent, it is the duty of the court to apply that intent to the case at hand and not look beyond the language of the statute to ascertain its meaning. However, if the language of the statute does not unambiguously set forth the legislative intent, the court will resort to judicial construction of the statute to ascertain and carry out the legislative intent.

*Berna-Mork v. Jones*, 174 Wis. 2d 645, 650-51, 498 N.W.2d 221, 223 (1993) (citations omitted).

A statute is ambiguous if reasonable persons could disagree as to its meaning, *Kollasch v. Adamany*, 104 Wis. 2d 552, 561, 313 N.W.2d 47, 51-52 (1980), or perhaps more accurately, "when it is capable of being understood by reasonably well-informed persons in either of two or more senses." *Wagner Mobil, Inc. v. City of Madison*, 190 Wis. 2d 585, 592, 527 N.W.2d 301, 303 (1994). Whether such persons could disagree poses a question of law for our independent resolution. *St. John Vianney Sch. v. Janesville Ed. Bd.*, 114 Wis. 2d 140, 150, 336 N.W.2d 387, 391 (Ct. App. 1983).

That the parties disagree on the meaning of the key words "consisting of" does not demonstrate that ambiguity exists. "The court should look to the language of the statute itself to determine whether 'well-informed' persons *should have* become confused." *National Amusement Co. v. Dept. of Revenue*, 41 Wis. 2d 261, 267, 163 N.W.2d 625, 628 (1969) (emphasis in original), *quoted with approval, Wagner Mobil, Inc. v. City of Madison*, 190 Wis. 2d at 592, 527 N.W.2d at 303-04.

Reasonably well-informed persons should agree that the phrase "consisting of school district profes-

748

sional employes" in § 111.70(4)(cm)5s, STATS., has the meaning the circuit court attributed to it. It plainly means consisting exclusively of, and only of, school district professional employees, as defined in § 111.70(1)(ne). It does not mean a mix of persons coming within and without the statutory definition.

The circuit court relied on the definition of "consisting" in BLACK'S, an accepted law dictionary: "**Consisting**. Being composed of or made up of. This word is not synonymous with 'including,' for the latter, when used in connection with a number of specified objects, always implies that there may be others which are not mentioned." BLACK'S LAW DICTIONARY 308 (6TH ED. 1990). Established precedent recognizes BLACK'S as a source for determining the ordinary and common meaning of a word. *State v. Demars*, 119 Wis. 2d 19, 23 n.7, 349 N.W.2d 708, 710 (Ct. App. 1989), and cases cited. However, because BLACK'S definition originates in 1878 case law, we choose to reach beyond it to contemporary dictionaries of the American language.[8]

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 484 (1976) defines the verb "consist," in material part, as "to become comprised." RANDOM HOUSE DICTIONARY

---

[8] The definitions of "consisting" are identical in BLACK'S first through its sixth editions, except that the first through the fourth editions cite to case law and the fifth and sixth do not. The first edition relied on a single case, *Farish v. Cook*, 6 Mo. App. 328 (1878). The *Farish* court relied on the "common acceptation" of "consisting of," in "Webster" and unspecified "lexicographers." *Id*. at 331-32.

We note other authorities in passing. ROGET'S II NEW THESAURUS 205 (1990) defines "consist of" as "To be the constituent parts of." THEODORE M. BERNSTEIN, THE CAREFUL WRITER 117 (1965), "*Consist of* is used to introduce the component parts, as in, 'the play consists of a prologue and three acts.' "

749

434 (2ND ED. 1966), defines "consist," in material part, "To be made up or composed (usually fol. by *of*) . . . ." AMERICAN HERITAGE DICTIONARY 402 (3RD ED. 1992), in material part, defines "consist" as "To be made up or composed." None of these three authorities defines "consist" in an inclusive sense.

A decent respect for language makes it impossible to read "consisting of" in the inclusive sense the district proposes. No rational basis exists in common and ordinary usage to ascribe that sense to "consisting of," and we see no reason to ascribe an uncommon intent to the legislature's usage when it wrote § 111.70(4)(cm)5s, STATS.

Nor does the use of "consisting of" in the inclusive sense occur elsewhere in the Wisconsin statutes. MTI asserts that the statutes use "consisting of" 482 times, and in each use the phrase specifies the exact, exclusive composition of whatever is defined. MTI notes that the legislature has taken care to modify "consisting of" when the phrase is intended to be inclusive. *See* § 946.13(2)(e), STATS. ("consisting in whole or in part of taxes in the process of collection"); § 94.64(1)(fm), STATS. ("a product consisting in whole or in part of sewage sludge"); and § 632.895(1)(b), STATS. ("consisting of one or more of the following:").[9]

---

[9] We add to MTI's analysis. On other occasions when the legislature intends to depart from an exclusive meaning of "consist of" or "consisting of," it has used the modifiers "substantially" or "primarily." Thus, § 66.46(2)(a), STATS., the tax increment law, defines "blighted area" as meaning various areas, including that "which is predominantly open and which consists *primarily of* an abandoned highway corridor . . . ." (Emphasis added.) When determining eligibility for unemployment benefits, the legislature provided in § 108.04(19), STATS., "An employe who performs services *substantially all of which*

Because the district has not attempted to refute MTI's statistical analysis, we infer that the district concedes its accuracy. A proposition asserted by a respondent on appeal and not disputed by the appellant's reply is taken as admitted. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99, 101 (Ct. App. 1994), *citing Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493, 499 (Ct. App. 1979).

Notwithstanding the plain meaning of "consisting of" in § 111.70(1)(b), STATS., the district urges that the interaction of subsec. (1)(b) with other subsections creates an ambiguity. The inconsistency of a subsection with other subsections in the same statute can create ambiguity. *See State v. Sutton*, 177 Wis. 2d 709, 716, 503 N.W.2d 326, 329 (Ct. App. 1993). The district asserts that §§ 111.70(1)(b) and 111.70(4)(cm)5s, when read with § 111.70(1)(ne), are subject to more than one interpretation.

The district first contends that to read the phrase "consisting of" as exclusive in § 111.70(4)(cm)5s, STATS., strips the district's teacher bargaining unit of its rights

---

*consist of* participating in sports or athletic events or training or preparing to so participate, shall be ineligible" in certain circumstances. (Emphasis added.) Wisconsin's public utility law allows a utility to "consolidate or merge with any Wisconsin corporation if *substantially all* of the assets of the corporation consist of the entire stock of the public utility . . . ." Section 196.80(1m)(d), STATS. (Emphasis added.) Section 196.805(2)(c), STATS., pertaining to consolidation or merger of telecommunications utilities, refers to "[c]onsolidation or merger of any Wisconsin corporation if *substantially all of the assets of the corporation consist of* the entire stock of the public utility." (Emphasis added.)

under MERA. That reading, it asserts, takes the unit outside the definition of a collective bargaining unit in § 111.70(1)(b), because the unit does not consist exclusively of school district professional employees or exclusively of employees who are not school district professional employees.

The district's contention misses the mark. Whether a mixed unit is a collective bargaining unit within the meaning of § 111.70(1)(b), STATS., is not the issue before us. The sole issue before us is the meaning of the disputed phrase in § 111.70(4)(cm)5s, and that meaning does not bind a future court or WERC when deciding whether a particular bargaining unit is entitled to collective bargaining under MERA. We decide appeals on the narrowest possible basis. *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989). That standard of review requires us to not decide whether the MTI unit loses its collective bargaining status under § 111.70(1)(b).

We reject the district's next contention, that the legislature's use of the term "professional school district employe," rather than "school district professional employe," in the second and third sentences of § 111.70(4)(cm)5s, STATS., renders that subsection ambiguous. The district argues that ambiguity results because although the first sentence in § 111.70(4)(cm)5s provides that if the employer submits the appropriate offer, "a unit consisting of school district professional employees" may not submit economic issues to arbitration on or after July 1, 1993, the last two sentences provide:

> In such a collective bargaining unit, economic issues concerning the wages, hours or conditions of

752

employment of the *professional school district
employes* in the unit for any period prior to July 1,
1993, are subject to interest arbitration under subd.
6. for that period. In such a collective bargaining
unit, noneconomic issues applicable to any period
on or after July 1, 1993, are subject to interest arbi-
tration after the parties have reached agreement
and stipulate to agreement on all economic issues
concerning the wages, hours or conditions of
employment of the *professional school district
employes* in the unit for that period. (Emphasis
added.)

Nowhere in MERA is "professional school district
employe" defined. Because the legislature took care in
§ 111.70(1)(ne) to narrowly define "school district pro-
fessional employe," the district contends it is illogical to
assume that "professional school district employe" has
the same meaning as "school district professional
employe" in § 111.70(4)(cm)5s. We disagree.

The first sentence in § 111.70(4)(cm)5s, STATS.,
restricts the application of that subsection to "a collec-
tive bargaining unit consisting of school district
professional employes." The second and third
sentences are similarly restricted. Each begins, "*In
such* a collective bargaining unit" (emphasis added)
and therefore refer to the unit described in the first
sentence. We conclude that "the professional school
district employes in the unit" are "the school district
professional employes" described in the first sentence.

The district next contends that we should apply a
principle once identified as Wisconsin's "alternative
plain-meaning rule" in *Mullen v. Coolong*, 132 Wis. 2d
440, 448, 393 N.W.2d 110, 113 (Ct. App. 1986), *over-
ruled on other grounds, Nicholson v. Home Ins. Cos.*,
137 Wis. 2d 581, 600-01, 405 N.W.2d 327, 334-35

(1987). The "alternative" rule is said to follow from the well-known rule of construction that the spirit or intention of the statute should govern over the literal or technical meaning of the language used. *City of Madison v. Town of Fitchburg*, 112 Wis. 2d 224, 236, 332 N.W.2d 782, 787 (1983). Thus, the district contends that literal meaning must not defeat the "obvious legislative purpose" in enacting § 111.70(4)(cm)5s, STATS.

Taking into account "purpose" merely aids determining the legislature's intent. To describe the search for purpose as an "alternative rule" overstates the reason for the search:

> Considerations of what purpose legislation is supposed to accomplish are often mentioned as grounds for the interpretation given to a statute. Explanation of the purpose is a way of focussing attention on an insight that is often helpful in making a judgment about intent or meaning. Judicial frustration, if not usurpation, of legislative authority, may be the result of reflexive judicial construction arrived at exclusively by considering the language of the statute on the basis of the judge's own received impressions as to what the language means, without regard for the purpose of the act and other aids to interpretation. (Footnote omitted.)

SUTHERLAND STATUTORY CONSTRUCTION (Vol. 2A, 5th ed. 1992), § 45.09.

We do not construe the statute on the basis of our "own received impressions as to what the language means." The legislature in § 111.70(1)(ne), STATS., carefully defined "school district professional employe." The legislature then created § 111.70(4)(cm)5s, and crafted that subsection to refer to the definition it had just created: "consisting of school district professional

employes." It used the words "consisting of," just as it has in many other statutes, words having a common, plain and ordinary meaning in authoritative dictionaries which the legislature has not been shown to have ignored before. The legislature's expressed intention to confine § 111.70(4)(cm)5s to collective bargaining units consisting exclusively of school district professional employees leaps out at the reader.

■■■

Given these circumstances, for us to conclude that § 111.70(4)(cm)5s, STATS., does not mean what it says would be judicial legislation at its worst. When the constitutional body vested with the obligation of enacting the laws of this State consistently uses certain words in a single sense, we must assume that the legislature expressed its intent in those very words. To nullify that intent on the basis of a supposedly unfulfilled purpose would exceed our judicial function, in the absence of extraordinarily clear and convincing evidence that the legislature failed to express what it meant. We cannot rewrite the statute to cover the district's desired construction of it. If the statute requires curative action, the remedy is with the legislature, not the courts. *La Crosse Hosp. v. La Crosse*, 133 Wis. 2d 335, 338, 395 N.W.2d 612, 613 (Ct. App. 1986).

The district asserts, however, that the legislature indeed intended mixed units to be subject to the QEO provisions in newly adopted § 111.70(4)(cm)5s, STATS. We are told that the legislature sought to relieve property taxes by changing MERA's interest arbitration provisions. The district urges us to examine the legislative history of the act, notwithstanding the plain meaning of the statute. We will not do so.

When a statute's meaning is plain, we may not look to the legislative history. *Aparacor, Inc. v. ILHR Dept.*, 97 Wis. 2d 399, 403, 293 N.W.2d 545, 547 (1980), and we may not look to that history to create an ambiguity where none exists. *Evangelical Alliance Mission v. Williams Bay*, 54 Wis. 2d 187, 190, 194 N.W.2d 646, 648 (1972). The intent of newly enacted § 111.70(4)(cm)5s, STATS., is plain and it is our duty "to apply that intent to the case at hand and not look beyond the language of the statute to ascertain its meaning." *Berna-Mork*, 174 Wis. 2d at 650-51, 498 N.W.2d at 223.

The district contends that our interpretation of § 111.70(4)(cm)5s, STATS., means that property tax relief will not apply uniformly throughout the State. According to the district, seventy-nine of the 343 state school districts responding to the district's survey have bargaining units which include at least one professional employee who does not meet the definition of "school district professional employe" in § 111.70(1)(ne). Hence, nearly one-fourth of the school districts responding to the survey are excluded from the provisions of § 111.70(4)(cm)5s.

That the statutory coverage is incomplete would not necessarily surprise the legislature. When it created a definition of "school district professional employe" in § 111.70(1)(ne), STATS., the legislature must have known that it was tightening the definition of "professional employe" in § 111.70(1)(L), a definition untouched by the amendments in 1993 Wis. Act 16.[10]

---

[10] Section 111.70(1)(L), STATS., generally defines "professional employe" as meaning an employee engaged in work: predominantly intellectual and varied in character as opposed to routine, mental, manual, mechanical or physical work;

In contrast, newly adopted § 111.70(1)(ne) concisely limits the definition of a "school district professional employe."

The only reasonable inference is that the legislature consciously drew a narrower application of § 111.70(4)(cm)5s, STATS., than the district contends is the case. The legislature must have known that some collective bargaining units are mixed. The district's survey nevertheless shows that the legislature achieved substantial coverage of the collective bargaining units in that § 111.70(4)(cm)5s apparently covers over seventy-five percent of the units in the responding districts. We therefore ought not, and we will not, stultify the legislature by adopting the district's interpretation of the statute.

## V. PETITION FOR UNIT CLARIFICATION

The district contends that because WERC has exclusive jurisdiction over unit-clarification proceedings, the circuit court lacked authority during the contract negotiations to prohibit the district from pursuing its petition to WERC for that relief. The district relies on § 111.70(4)(d)5, STATS., which provides in pertinent part, "Questions as to representation may be raised by petition of the municipal employer or any municipal employe or any representative thereof," and

---

involving the consistent exercise of discretion and judgment in its performance; of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; or work which requires knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher education or a hospital.

on other directives to WERC for resolving issues regarding determination of an appropriate unit for collective bargaining. Section 111.70(4)(d)1 through 4.

The Wisconsin Supreme Court has said that § 111.70(4)(d)2a, STATS., "charges the commission with the duty of determining appropriate bargaining units." *Arrowhead United Teachers v. ERC*, 116 Wis. 2d 580, 595, 342 N.W.2d 709, 717 (1984). No published opinion, however, including *Arrowhead*, has held that WERC has "exclusive jurisdiction" to the total exclusion of the circuit courts.

WERC cannot have "exclusive jurisdiction" vis-a-vis the circuit courts. The state constitution grants plenary subject-matter jurisdiction to the circuit courts. "[T]he power of the circuit court is conferred not by the act of the legislature but by the Constitution itself. Circuit court jurisdiction is general and extends to all matters civil and criminal." *In Matter of Guardianship of Eberhardy*, 102 Wis. 2d 539, 550, 307 N.W.2d 881, 886 (1981) (citations omitted). "[T]he jurisdiction conferred by the Constitution in 1977 upon circuit courts is plenary in respect to all matters at law or in chancery . . . ." *Id*. at 551, 307 N.W.2d at 886.

Hence, "No circuit court is without subject-matter jurisdiction to entertain actions of any nature whatsoever." *Mueller*, 105 Wis. 2d at 176, 313 N.W.2d at 792. The *Mueller* court added, however, the legislature "may set standards for exhaustion of administrative remedies or for primary jurisdiction prior to the proper invocation of the court system's subject matter jurisdiction." *Id*. at 176, 313 N.W.2d at 792. The legislature may restrict the circuit court's competency to act, *id*. at 177, 313 N.W.2d at 793, but no statute expressly

758

restricts the competency of a circuit court when asked to enjoin WERC from proceeding on a clarification petition.

Accordingly, the question is whether the doctrines of exhaustion of administrative remedies or of primary jurisdiction prevented the circuit court from enjoining the district from pursuing its clarification petition before WERC.[11]

The exhaustion doctrine does not apply. The doctrine requires parties to exhaust their administrative remedies before seeking judicial relief. *Nodell Inv. Corp. v. Glendale*, 78 Wis. 2d 416, 424, 254 N.W.2d 310, 315 (1977). Exhaustion is required only as to administrative proceedings underway and not yet completed. *Sawejka v. Morgan*, 56 Wis. 2d 70, 79, 201 N.W.2d 528, 533 (1972) (citation omitted). MTI did not begin administrative proceedings before or after bringing its action for declaratory and injunctive relief.

As we said in Part III, the purpose of the primary jurisdiction doctrine is to promote the proper relationship between administrative agencies and the circuit courts, and the courts have discretion whether to retain jurisdiction. *Brookfield*, 171 Wis. 2d at 420, 491 N.W.2d at 491.

We first note that the court order did not prohibit the district from seeking unit clarification after its negotiations with MTI had been completed. The court

---

[11] WERC itself acknowledges indirectly that this is the issue. WERC states in its non-party brief that because the legislature has empowered WERC to determine appropriate collective bargaining units, the courts should give WERC the first opportunity to determine an appropriate bargaining unit, regardless "whether such deference is characterized as exclusive or primary jurisdiction."

did not intend for its injunction to be permanent. In its oral decision the court referred to MTI's position that "for the district to petition to WERC *at this time* to ask for a unit clarification was the equivalent of a breach of contract." (Emphasis added.) The court noted that the case law in this state "does not deal with the situation where the parties *are in negotiations*" and seek a unit clarification. (Emphasis added.) The court concluded by finding that for the district "to continue with the petition *at this time*, would be tantamount to bad faith bargaining." (Emphasis added.)

Therefore, we decide only whether, under the doctrine of primary jurisdiction, the circuit court erroneously exercised its discretion when it enjoined the district from proceeding with its clarification petition until the parties reached a successor agreement. We conclude that the court properly exercised its discretion.

The circuit court exercised its discretion partly on its conclusion that by pursuing the clarification petition the district engaged in a prohibited practice in violation of § 111.70(3)(a)4, STATS.[12] We need not decide whether the court's conclusion was an error of law. The court also relied on its equitable power, and that provides a proper basis for its decision.

In its oral decision, the circuit court said that to allow the district to proceed "makes the whole [negotiation] scene very, very murky," and that if the district succeeded on its petition, it "would be getting through

---

[12] Section 111.70(3)(a), STATS., provides in part:

"It is a prohibited practice for a municipal employer . . .

4. To refuse to bargain collectively with a representative of a majority of its employes in an appropriate collective bargaining unit . . . ."

the back door what [it] did not get through the front door, which the statute, by its plain meaning, does not allow." The court then granted the injunction,

> And *under my equitable power*, and weighing heavily in my use of discretion with that, is not only the plain meaning of the statute, as I construed it, *but also the problems that such a petition creates for collective bargaining and [for] some meeting of the minds of the parties, or binding arbitration, but also as [to] the interest* of the public. (Emphasis added.)

The circuit court's formal findings and conclusions elucidate its oral decision, including the following among its reasons for enjoining the district: "The District's attempt to break up this unit and exclude a major component of it *at this time, when the parties are involved in negotiations and mediation, are at or near impasse, and the District has petitioned for arbitration, is disruptive of the collective bargaining process.*" (Emphasis added.)

We conclude that the circuit court properly exercised its discretion when it retained jurisdiction and enjoined the district from proceeding on its clarification petition to WERC until the parties completed their negotiations.

## VI. CONTENTIONS OF NON-PARTIES

We granted WERC leave to brief whether WERC has exclusive authority to determine the appropriate bargaining units under MERA. WERC contends that the circuit court "improperly usurped" its authority to determine appropriate bargaining units. We have already decided that issue, to the extent it pertains to the district's clarification petition. WERC appears to contend, however, that for a court to construe

761

§ 111.70(4)(cm)5s, STATS., usurps WERC's duty under § 111.70(4)(d)2a, to "determine the appropriate bargaining unit for the purpose of collective bargaining . . . ."

As we have said, the sole issue before us is whether, in § 111.70(4)(cm)5s, STATS., "a collective bargaining unit consisting of school district professional employes," includes mixed units. We have decided that the collective bargaining unit described in that statute cannot be a mixed unit.

For a court to decide the meaning of the disputed phrase in that statute does not usurp WERC's function under § 111.70(4)(d)2a, STATS. WERC has the duty, when requested, to determine appropriate bargaining units in accordance with the law, and when, as here, a court articulates the meaning of the key phrase in § 111.70(4)(cm)5s, the court's decision binds WERC. That decision supplies the meaning of the term which WERC must apply if WERC is called upon to determine the appropriate bargaining unit for purposes of § 111.70(4)(cm)5s. Neither the circuit court nor this court has usurped WERC's jurisdiction.

In its non-party brief, the Wisconsin Association of School Boards contends that we should reverse the circuit court's interpretation of § 111.70(4)(cm)5s, STATS., because it results in an absurd distinction between otherwise similar school districts and is inconsistent with the financial balancing of interests at the heart of 1993 Wis. Act 16. The Association contends that by interpreting § 111.70(1)(b) to exclude mixed units from coverage under § 111.70(4)(cm)5s, the circuit court effectively undermined the balance struck by the legislature. The Association also asserts that neither the circuit court nor MTI offered evidence to support a find-

ing that the legislature intended to exempt one school district's teacher bargaining unit from the QEO concept in § 111.70(4)(cm)5s while imposing the same concept on a similar school district.

But we have *not* interpreted § 111.70(1)(b), STATS., to exclude mixed units from § 111.70(4)(cm)5s. We have held *only* that § 111.70(4)(cm)5s excludes mixed units. The plain meaning of that statute has evinced the legislative intent. We cannot ignore that intent even if it results in a differentiation between various districts. The legislature must have foreseen that differentiation, because the legislature chose to limit the application of the QEO provisions in § 111.70(4)(cm)5s to "a collective bargaining unit consisting of school district professional employes . . . ."

The Association's additional contention that we should disapprove the circuit court's decision because it adversely affects uniformity among school districts and therefore violates public policy, is based on Art. X, sec. 3 of the Wisconsin Constitution. Article X, sec. 3 provides in relevant part, "The legislature shall provide by law for the establishment of school districts, which shall be as nearly uniform as practicable . . . ."

The Association does not flatly argue that the circuit court's decision violates the uniformity provision in Art. X, sec. 3. Rather, the Association skirts the issue by asserting it is unlikely that the legislature, mindful of the constitutional obligation and mindful of the difficulties revenue limits create for local school boards, intended to fashion a school finance package limiting revenue for all school districts while putting limits on the financial aspects of interest arbitration for only some school districts. The fact is, however, that the

legislature announced its intent in plain words. We may not ignore it.

The Association suggests that the circuit court's interpretation of the law raises "equal protection problems." The Association labels the issue without discussing it and without providing authority to assist us. We will not review constitutional points merely raised but not argued. *Dumas v. State*, 90 Wis. 2d 518, 523, 280 N.W.2d 310, 313 (Ct. App. 1979). We leave the Association's reference to "equal protection problems," without further discussion.

## VII. CONCLUSION

For the reasons stated, the judgment must be affirmed.

*By the Court.*—Judgment affirmed.

SUNDBY, J. (*concurring in part; dissenting in part*). I concur with the majority that the circuit court properly retained jurisdiction to interpret 1993 Wis. Act 16, specifically those provisions of § 111.70, STATS., which substitute a "qualified economic offer" (QEO) for final and binding arbitration. However, I do not agree with the trial court's conclusion that the Act precludes the Madison school district from submitting a QEO to Madison Teachers, Inc. (MTI) in collective bargaining because MTI is a "mixed" bargaining unit, that is, a unit containing professionals licensed under § 115.28(7), STATS., and unlicensed employees. That interpretation is contrary to the clear legislative intent and substantially emasculates the Act.

The interpretation of the Act is a question of law and the Wisconsin Employment Relations Commission

has no expertise which would assist a court in interpreting the Act. *See Hill v. LIRC*, 184 Wis. 2d 101, 109, 516 N.W.2d 441, 445-46 (Ct. App. 1994). Therefore, the circuit court properly retained jurisdiction to determine the reach of the Act. However, the court should have deferred to the commission's expertise in clarifying the composition of the bargaining unit. Here, the commission not only has expertise but it has primary jurisdiction to the exclusion of the courts, except the courts' appellate jurisdiction.

The battle between the Governor and the teachers' unions over final and binding arbitration received extensive media coverage. Plainly, it was the intention of the administration and the legislature to substitute the QEO for final and binding arbitration for teachers. The view was expressed in many quarters that spending by school districts must be controlled. The view of the administration was that excessive spending by school districts was directly related to the ability of teachers' unions to substitute virtually unreviewable decisions of unelected arbitrators for the discretion of school boards.

We start, therefore, with a clear expression of legislative intent. If we must conclude, as MTI insists, that because it is a "mixed unit," that is, it includes employees who are not teachers, it is not subject to the QEO substitute for final and binding arbitration, the legislative language must be so clear that there is no room to effect the legislative intent.

We have long cherished a tradition which accords considerable deference to the legislature's ability to say what it means. However, the written word is a poor vessel from which to pour meaning. Over fifty percent of the appeals we consider require that we construe a statute or administrative rule, many of which are

ambiguous. I cite this statistic not in criticism of the legislature's inability to clearly express its intent, but in recognition that the legislature's "clarity" may be the court's confusion. I cannot agree with MTI that the defining statute, § 111.70(4)(cm)5s, STATS., unambiguously excludes "mixed" bargaining units from the QEO option. The statute provides in part:

> "Issues subject to arbitration." In a collective bargaining unit consisting of school district professional employes, if the municipal employer submits a qualified economic offer applicable to any period beginning on or after July 1, 1993, no economic issues are subject to interest arbitration under subd. 6. for that period.

We can be sure that the legislature did not intend that twenty-three percent of the state's school districts, including its second largest, would be exempt from legislation intended to reduce school district costs. Teachers' salaries and benefits typically account for the largest part of school salary and benefit costs; in the Madison district, the percentage is ninety-seven percent. We therefore start our analysis knowing that the legislature intended to allow *all* school districts to substitute the QEO procedure for final and binding arbitration in school district/teacher union collective bargaining.

This is not really a case in which we must discover the legislative intent from the words of a statute. We must decide whether we may, consistent with our obligation to responsibly construe legislation, conclude that school districts and "mixed" bargaining units are subject to the QEO procedure.

I am impressed that the district's attorneys uncovered an 1893 dictionary definition of "consisting of" which supports its position. *See* A NEW ENGLISH DIC-

TIONARY ON HISTORICAL PRINCIPLES, Oxford, Vol. IIC, 861, 862 (1893) ("Consisting of" can have the meaning of "to have its essential character in" or "foundation in."). I see no need to resort to a definition 102 years old; nor is it necessary to consult extrinsic sources to determine the legislature's intent. The language of the Act itself supports the legislative intent.

When I first read the Act, I feared that the legislature had dropped too many stitches to permit us to repair the fabric. *See Scharping v. Johnson*, 32 Wis. 2d 383, 393 n.6, 145 N.W.2d 691, 697 (1966). However, I was persuaded by the district's argument that to construe the Act to not apply to "mixed" bargaining units would lead to an absurd or unreasonable result. *See State v. Moore*, 167 Wis. 2d 491, 496, 481 N.W.2d 633, 635 (1992) (A court "must interpret [a statute] in such a way as to avoid an absurd or unreasonable result."). The Act applies to collective bargaining units. Section 111.70(1)(b), STATS., defines a "collective bargaining unit" to mean "a unit consisting of municipal employes who are school district professional employes or of municipal employes who are not school district professional employes that is determined by the commission to be appropriate for the purpose of collective bargaining." To be a "school district professional employe," the employee must hold a license issued by the State Superintendent of Public Instruction under § 115.28(7), STATS. Section 111.70(1)(ne). MTI includes 2062 employees licensed by DPI and 308 non-professional employees. If we interpret "consisting of" as narrowly as MTI suggests, it will have no standing under the Municipal Employment Relations Act (MERA), §§ 111.70-77, STATS., because it cannot qualify as a "collective bargaining unit."

MTI recognizes that it would be catastrophic to construe "collective bargaining unit" to exclude any "mixed" unit consisting of school district professional employees and "others." It argues:

> The logical extension of such a drastic statutory change would lead to chaos. For example, if a mixed unit were not covered by MERA, the employees in the unit would have no statutory dispute resolution procedures available. Wis. Stat. § 111.70(4)(L), which prohibits strikes, would no longer prevent such a mixed unit from striking.

Worse, a mixed unit would have no standing to insist that the municipal employer bargain with it.

MTI asks us to weave the necessary language into § 111.70(1)(b), STATS., to make "mixed" bargaining units subject to MERA in other respects but does not want us to repair § 111.70(4)(cm)5s so that the QEO option is available where a unit contains other employees as well as teachers. I conclude that when the whole of the fabric from the legislative loom is considered, no judicial weaving is necessary. Section 111.70(4)(cm)5s provides in part: "In such a collective bargaining unit ['consisting of school district professional employes'], economic issues concerning the wages, hours or conditions of employment of the professional school district employes *in the unit* for any period prior to July 1, 1993, are subject to interest arbitration under subd. 6. for that period." (Emphasis added.) Prior to July 1, 1993, "the unit" included teachers and other district employees. MTI apparently contends that after July 1, 1993, "consisting of school district professional employes" assumed a new meaning, which now requires unit "purity." This is an unreasonable construction.

The "economic issues" which may be addressed in a QEO, § 111.70(1)(dm), Stats., "shift premium pay," "lead worker pay," and "hazardous duty pay," suggest that employees other than teachers may be subject to a QEO. These "issues" are not customarily bargained with teachers.

While I agree that the circuit court had competence to construe 1993 Wis. Act 16, I do not agree that the court had competence to restrain the district from petitioning the commission for unit clarification. Here the commission clearly has expertise and primary resort should be the rule. The courts have only appellate jurisdiction to review orders of the commission clarifying collective bargaining units.

The district, of course, wished to eliminate any question as to its authority to submit a QEO to the union. The trial court concluded that, by its act, the district bargained in bad faith and committed a prohibited practice. I consider it impossible for a municipal employer or a collective bargaining unit to commit a prohibited practice when that practice is specifically permitted by MERA. I am unable to identify any provision of § 111.70(3), Stats., which makes it a prohibited practice for a municipal employer to petition the commission to clarify the bargaining unit.

Section 111.70(1)(b), Stats., defines a "collective bargaining unit" to mean a unit "determined by the commission to be appropriate for the purpose of collective bargaining." Section 111.70(4) enumerates the powers of the commission. Paragraph (d)2.a provides in part: "The commission shall determine the appropriate bargaining unit for the purpose of collective bargaining . . . ." Subdivision 5 provides in part:

> Questions as to representation may be raised by petition of the municipal employer or any munic-

ipal employe or any representative thereof. Where it appears by the petition that a situation exists requiring prompt action so as to prevent or terminate an emergency, the commission shall act upon the petition forthwith.

The district acted properly in asking for the assistance of the commission. It considered that it was necessary to obtain "clarification" to prevent an emergency.

The entire philosophy of the Municipal Employment Relations Act is to achieve "industrial" peace in municipal employment. Section 111.70(6), STATS., provides in part: "If [collective bargaining] procedures fail, the parties should have available to them a fair, speedy, effective and, above all, peaceful procedure for settlement as provided in this subchapter." While not specifically applicable to municipal employment, § 111.01(2), STATS., is instructive. That statute provides in part: "Industrial peace, regular and adequate income for the employe, and uninterrupted production of goods and services are promotive of all of these interests [the public, the employe, and the employer]." "Clarification" of bargaining units is an important implementation of peace in municipal collective bargaining. Clarification avoids bargaining units whose members have incompatible interests. The commission has as much experience in defining and clarifying bargaining units as almost any other aspect of municipal collective bargaining. When we tread that ground without the commission's input, our footing cannot be secure.

When the Act is considered in its entirety we need not rewrite it; it authorizes school districts to offer QEO's to bargaining units containing teachers and other district employees. However, the Act should be "repaired" to eliminate the obvious ambiguities. Per-

haps the Council created to study the performance of the Act may accomplish this before the Act "sunsets" July 1, 1996.