151 T.C. No. 11

UNITED STATES TAX COURT

PATIENTS MUTUAL ASSISTANCE COLLECTIVE CORPORATION d.b.a.
HARBORSIDE HEALTH CENTER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 29212-11, 30851-12,       Filed November 29, 2018.
14776-14.[1]

     California medical-marijuana dispensary P deducted I.R.C. section 162 business expenses and adjusted for indirect COGS per the I.R.C. section 263A UNICAP rules for producers. R determined that P's sole trade or business was trafficking in a controlled substance and that I.R.C. section 280E prevented it from deducting business expenses. R also determined that P had to calculate COGS using the I.R.C. section 471 regulations for resellers and was liable for accuracy-related penalties. P argued that I.R.C. section 280E didn't apply to it, that it was a producer, and that a dismissed civil-forfeiture action precluded a deficiency action.

---

[1] We consolidated the cases at docket numbers 29212-11, 30851-12, and 14776-14 for trial, briefing, and opinion.

Held:  The Government's dismissal with prejudice of a civil-forfeiture action against P does not bar deficiency determinations.

Held, further, I.R.C. section 280E prevents P from deducting ordinary and necessary business expenses.

Held, further, during the years at issue P was engaged in only one trade or business, which was trafficking in a controlled substance.

Held, further, P must adjust for COGS according to the I.R.C. section 471 regulations for resellers.

Henry G. Wykowski and Matthew A. Williams, for petitioner.

Nicholas J. Singer and Julie Ann Fields, for respondent.

HOLMES, Judge:  Patients Mutual owns what may well be the largest marijuana dispensary in America.  To the Commissioner that just makes it a giant drug trafficker, unentitled to the usual deductions that legitimate businesses can claim, unable even to capitalize its indirect costs into its inventory, and subject to penalties for taking contrary positions on its tax returns for the tax years ending July 31, 2007 through 2012.  Patients Mutual wants to be treated like any other business because it follows California law, it does more than distribute marijuana, and the federal government already decided not to pursue a civil-forfeiture action against it.

FINDINGS OF FACT

I.     California Medical-Marijuana Law

Under federal law marijuana is a Schedule I controlled substance.  See

Controlled Substances Act, Pub. L. No. 91-513, sec. 202, 84 Stat. at 1249

(codified as amended at 21 U.S.C. sec. 812 (2012)).  This means that under federal

law the manufacture, distribution, dispensation, or possession of marijuana--even

medical marijuana recommended by a physician--is prohibited.  See id. sec.

841(a); Californians Helping to Alleviate Med. Problems, Inc. v. Commissioner

(CHAMP), 128 T.C. 173, 181 (2007) (citing United States v. Oakland Cannabis

Buyers' Coop., 532 U.S. 483 (2001)).

Under California law, things are somewhat different.  In 1996 California

voters adopted Proposition 215--the California Compassionate Use Act of 1996

(CCUA)--to "ensure that seriously ill Californians have the right to obtain and use

marijuana for medical purposes."  See Cal. Health & Safety Code sec.

11362.5(b)(1)(A) (West 2007).  The CCUA provides an exemption from

California laws penalizing the possession and cultivation of marijuana for patients

and their primary caregivers when the possession or cultivation is for the patient's

personal medical purposes and recommended or approved by a physician.  Id. sec.

11362.5(d).  California later legalized collective or cooperative cultivation of

marijuana for medicinal purposes.  Id. sec. 11362.775; see also People v. Colvin, 137 Cal. Rptr. 3d 856, 860 (Ct. App. 2012).  These laws led to the formation of the first marijuana dispensaries.[2]

## II.      DeAngelo and Harborside

Steve DeAngelo saw these early dispensaries--which he described as being run by either well-meaning marijuana activists with no business experience or "thug operators"--and realized patients needed a better option.  So in 2005 DeAngelo cofounded Patients Mutual Assistance Collective Corporation d.b.a. Harborside Health Center (Harborside) to be the "gold standard" in medical-marijuana dispensaries.  His goal was to create a place where marijuana could be distributed responsibly, that was focused on patient care, and that provided benefits to both patients and the community.  Harborside opened its doors in October 2006 and has grown into a booming business with more than 100,000 patient visits per year.  It also generated a gusher of revenue during the years at issue:

---

[2] On November 8, 2016, California voters adopted Proposition 64, which made recreational marijuana use legal under California law.  See Cal. Health & Safety Code sec. 11362.1 (West 2017).

| Year | Nonmarijuana sales revenue | Marijuana sales revenue | Total revenue | Marijuana percentage |
|---|---|---|---|---|
| 2007 | $487 | $5,448,635 | $5,449,122 | 99.99 |
| 2008 | 3,990 | 10,916,914 | 10,920,904 | 99.96 |
| 2009 | 16,878 | 17,334,597 | 17,351,475 | 99.90 |
| 2010 | 42,492 | 22,047,372 | 22,089,864 | 99.81 |
| 2011 | 58,588 | 20,895,823 | 20,954,411 | 99.72 |
| 2012 | 320,651 | 25,199,997 | 25,520,648 | 98.74 |
| Total | 443,086 | 101,843,338 | 102,286,424 | 99.57 |

At all relevant times Harborside operated out of an approximately 7,500-square-foot space that had a reception area, healing room, purchasing office, processing room, clone room, and multipurpose room. The facility also had a large sales floor, offices, storage areas, restrooms, and a break room with a kitchen.

But operating a dispensary is no small task. DeAngelo had to make sure Harborside complied with California and local laws. This included getting proper permits, running as a nonprofit, and operating under a "closed-loop" system. Harborside interpreted the "closed-loop" requirement to mean that all of its marijuana must be provided by its patients; sold exclusively to its patients; handled only by its employees, all of whom were its patients; and not diverted into the illegal market. How Harborside achieved all of this is important, so we will start with how Harborside sourced and processed its inventory.

A.    Sourcing and Processing

Harborside sold a wide variety of products, which we will divide into four main groups--clones, marijuana flowers, marijuana-containing products, and non-marijuana-containing products.

1.    Clones

Clones are cuttings from a female cannabis plant that can be transplanted and used to cultivate marijuana.  Harborside bought clones from clone nurseries, cared for them while they were in its store, repackaged them, and then sold them to its patients.  It stored the clones in a clone room and sold them at a clone counter--the portion of the floor space dedicated to clone sales.  During the years at issue Harborside had at least four employees who spent their time entirely in the purchase and sale of clones.

2.    Marijuana Flowers

The Court learned at trial that it's not the leaves of the marijuana plant, but its flowers--or buds--that people can smoke.[3]  Harborside purchased all of its marijuana flowers from its patient-growers.  Some of these growers promised to sell what they cultivated back to Harborside, and Harborside gave them either

---

[3] The Court suspects, but makes no finding, that this may be why repurposed beer-marketing material--"This Bud's for you"--seems to be common where marijuana is sold.

seeds or clones to get started. Other growers, however, bought seeds and clones from Harborside. However they acquired their starter supplies, growers who were interested in selling to Harborside had to sign a cultivation agreement and were encouraged to take one of Harborside's free grow classes and follow its best-practices guides.

Once a grower had cultivated, harvested, trimmed, flushed, dried, and cured his marijuana buds, he would bring them to Harborside to sell. Harborside had a purchasing office to inspect and test the incoming marijuana. Harborside would reject marijuana if it wasn't properly cured, if it hadn't been sufficiently trimmed, if it had an incurable safety issue such as pathogenic mold, or if it didn't contain the right "cannabinoid profile." If, for example, Harborside was in need of a strain of marijuana that was rich in CBD,[4] it might reject a batch of marijuana that was rich in THC.[5] There were times Harborside rejected the "vast majority" of the bud that growers brought in, and a grower whose marijuana was rejected got no compensation (though he was free to sell it to another collective if he could).

---

[4] CBD is the abbreviation for cannabidiol, a potent antiinflammatory compound.

[5] THC stands for tetrahydrocannabinol, the compound in marijuana believed to be responsible for providing a euphoric effect, or "high", as users call it.

On the other hand, if Harborside agreed to buy the marijuana, it would negotiate a price with the grower--typically enough to cover the grower's actual growing expenses and a reasonable amount for his time and labor. It stored the marijuana in a vault--a reinforced concrete room with a bank-vault door and biometric locks--and sent a sample of the marijuana out for testing by a third-party laboratory. If all went well, the marijuana would go to a processing room where it was reinspected, remanicured, retrimmed, and then weighed, packaged, and labeled. Harborside staff would put it on display on the sales floor or put it back in the vault until needed. Harborside had at least three employees dedicated to acquiring inventory, at least four devoted to managing inventory, and still others whose sole job was to process the bulk marijuana and ready it for resale.

### 3. Marijuana-Containing Products

Harborside's marijuana-containing products included edibles, beverages, extracts, concentrates, oils, topicals, and tinctures--marijuana-infused alcohol, vinegar, or glycerin. Harborside bought these items from other collectives, tested them, repackaged them if they came in bulk or needed child-proof packaging, relabeled them, and then sold them to its own patients. Harborside's human-resources director credibly estimated that about 55% to 60% of its employees'

total time was spent on buying and processing marijuana--both the buds and marijuana-containing products--and another 25% to 30% selling it.

### 4. Non-Marijuana-Containing Products

Harborside also sold non-marijuana-containing products. These included branded gear such as shirts, hats, and pins; nonbranded gear such as socks and hemp bags; and a variety of other products including books, dabbing equipment,[6] rolling papers, and lighters. Harborside bought these items from outside vendors, stored them, and resold them to patients. Depending on the volume on hand, Harborside stored the non-marijuana-containing products on the sales floor and in one or more of its various storage rooms. A little less than 25% of the sales floor was used to display and sell these items and around 5% to 10% of Harborside's employees' time was dedicated to buying and selling these entirely legal products.

### B. Sales and Pricing

Harborside took great care to avoid its marijuana's leaking into the black market. For example, no one could enter the sales floor without going through a "very rigorous identification process." This process required new patients to

---

[6] "Dabbing" means heating products that contain marijuana so as to create an intoxicating vapor. It may or may not have a connection to the strange fad among the young that seems to consist of pointing to the sky with one arm while putting one's face in the crook of the other arm while seeming to sneeze or sniff.

present valid photo IDs, have written recommendations from physicians licensed to practice in California, sign a collective cultivation agreement giving other Harborside patients the right to cultivate marijuana on their behalf, and agree to abide by Harborside's rules and regulations. Harborside also sold its marijuana at a premium above the black-market rate to discourage its patients from reselling it. The exact method used to determine the sale price is unclear from the record, but DeAngelo testified that Harborside looked "at [its] general overall picture and determined the margin that we needed to place on every bit of cannabis that came in."

C.    Community Outreach

With premium prices, however, come significant profits. Harborside is a C corporation for federal tax purposes,[7] but to comply with California's nonprofit requirement,[8] its bylaws prohibited it from paying dividends or selling equity, and

---

[7] The IRS has determined that a marijuana dispensary generally cannot qualify as a tax-exempt organization under section 501(c)(3) because it is engaged in what federal law regards as a criminal enterprise and thus is not operated exclusively for charitable purposes. Rev. Rul. 75-384, 1975-2 C.B. 204; see also Priv. Ltr. Rul. 201224036 (June 15, 2012). (Unless we say otherwise, all section references are to the Internal Revenue Code in effect for the years at issue.)

[8] California laws decriminalizing medical marijuana specifically stated that they did not "authorize any individual or group to cultivate or distribute cannabis for profit." Cal. Health & Safety Code sec. 11362.765(a) (West 2007).

required it to use any excess revenue for the benefit of its patients or the community. To this end, Harborside provided its patients with a wide variety of services at no additional cost. It told patients during their orientation--and again with signs on the premises--that part of the purchase price of the marijuana would be used to pay for patient services and community outreach. But patients were not required to buy marijuana to use the services.

The services included one-on-one therapeutic sessions for reiki, hypnotherapy, naturopathy, acupuncture, and chiropractic consultations as well as group sessions for yoga, qigong, the Alexander technique, and tai chi. Harborside also offered grow classes, support groups, addiction treatment counseling, and a "sliding scale program" that gave discounts to patients with financial difficulties. All of the services were coordinated by Harborside's holistic-services director and took place in either Harborside's healing room or its multipurpose room. Harborside footed the bill and paid the service providers--all of whom were independent contractors. The total amounts paid were:

| Year | Amount |
|------|--------|
| 2007 | $30,290 |
| 2008 | 93,341 |
| 2009 | 119,884 |
| 2010 | 144,441 |
| 2011 | 141,926 |
| 2012 | 150,466 |

D.    Administrative Functions

Harborside had other employees in support roles.  The security department, for example, spent most of its time checking in both patients and vendors and then escorting vendors into the back of the building to meet with a purchasing manager. Harborside's human-resources director estimated that the security group spent 60% of its time checking in patients who came to buy marijuana, another 5% checking in people on site to receive a service, and the rest in assisting vendors. Harborside also had an administrative group, which included employees in its ombuds,[9] finance, human resources, and facilities departments as well as its executives.

---

[9] This is not a typo.  It's Harborside's pun.

III.    Forfeiture Action

All seemed well until July 2012, when the federal government filed a civil-forfeiture action in the U.S. District Court for the Northern District of California. The lawsuit alleged that the property which Harborside rents and on which it operates its business was subject to forfeiture because it was used to commit the distribution, cultivation, and possession of marijuana in violation of 21 U.S.C. sections 841(a)[10] and 856.[11]  The action was dismissed with prejudice in May 2016 by stipulation of the parties.

IV.    Tax Returns and Audit

The forfeiture action wasn't Harborside's only run-in with the federal government--it also caught the attention of the IRS.  Recall that Harborside is a C corporation for federal tax purposes with tax years ending July 31.  It filed Forms 1120, U.S. Corporation Income Tax Return, for 2007 to 2012 and later amended its 2007, 2008, and 2009 returns.  These returns were selected for audits that led to

---

[10] Title 21 U.S.C. section 841(a)(1) (2012) states that "it shall be unlawful for any person knowingly or intentionally * * * to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

[11] 21 U.S.C. section 856(a)(1) states that it shall be unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance."

the issuance of three notices of deficiency--one for 2007 and 2008, one for 2009 and 2010, and one for 2011 and 2012. The notices denied most of Harborside's claimed deductions and costs of goods sold, and asserted tens of millions in deficiencies and accuracy-related penalties.

The IRS's primary reason for its adjustments was that "[n]o deduction or credit shall be allowed for any amount paid or incurred during the taxable year in carrying on a trade or business that consists of trafficking in controlled substances."

Harborside filed timely petitions for all years at issue. Its principal place of business was in California at all relevant times, so absent a stipulation by the parties these cases are appealable to the Ninth Circuit. See sec. 7482(b)(1)(B).

OPINION

I.    Background

The CCUA did not decriminalize marijuana in California. See, e.g., People v. Harris, 52 Cal. Rptr. 3d 577, 582 (Ct. App. 2006) (marijuana remained a controlled substance under California law). It instead created an affirmative defense to charges of possessing or cultivating marijuana for persons who did so for personal, physician-approved use. Cal. Health & Safety Code sec. 11362.5(d);

People v. Wright, 146 P.3d 531, 533 (Cal. 2006). Primary caregivers of such persons could also raise the defense. Cal. Health & Safety Code sec. 11362.5(d).

In 2003 California enacted the Medical Marijuana Program Act (MMPA), also known as Senate Bill 420 and now codified at California Health and Safety Code sections 11362.7-11362.83. The MMPA extended the CCUA's affirmative defense to charges of transporting marijuana for patients and primary caregivers who "associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes."[12] Cal. Health & Safety Code sec. 11362.775; People v. Urziceanu, 33 Cal. Rptr. 3d 859, 883-84 (Ct. App. 2005). It also instructed California's attorney general to develop guidelines to "ensure the security and nondiversion of marijuana grown for medical use." Cal. Health & Safety Code sec. 11362.81(d). Those guidelines stated that medical-marijuana cooperatives should be formally organized, not operate for profit, maintain business licenses and permits, pay tax, verify each member's status as a patient, execute an agreement with each member regarding the use and distribution of

---

[12] The MMPA also set per-person quantity limits for harvested marijuana and marijuana plants, although the California Supreme Court invalidated these as impermissible amendments to the CCUA. People v. Kelley, 222 P.3d 186, 197-200, 213-14 (Cal. 2010). Patients and caregivers were thereafter allowed to possess, cultivate, or transport whatever amount of marijuana was "reasonably related to the patient's current medical needs." Id. at 188 (quoting People v. Trippet, 66 Cal. Rptr. 2d 559, 570 (Ct. App. 1997)).

marijuana, keep records of distribution, and neither buy marijuana from nor distribute marijuana to nonmembers. Qualified Patients Assoc. v. City of Anaheim, 115 Cal. Rptr. 3d 89, 97-98 (Ct. App. 2010); People v. Hochanadel, 98 Cal. Rptr. 3d 347, 356-58 (Ct. App. 2009); Cal. Att'y Gen., Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use 8-10 (2008).

Federal law did not follow. The conflict between federal and state law went to the Supreme Court in 2005 when two California medical-marijuana users tried to enjoin the U.S. Attorney General and the Drug Enforcement Agency from enforcing federal marijuana law against them. See Gonzales v. Raich, 545 U.S. 1, 7 (2005). The Court upheld the federal prohibition on marijuana sale and possession with respect to medical-marijuana users, both under the Commerce Clause, U.S. Const. art. I, sec. 8, cl. 3, and the Supremacy Clause, U.S. Const. art. VI, cl. 2. Raich, 545 U.S. at 22, 29.

One might think the Supremacy Clause would have stifled the spread of state attempts at legalizing what remained illegal under federal law. But one would be wrong. And Congress complicated the situation by enacting a series of appropriations riders that prevent the Department of Justice (DOJ) from using any funds "to prevent * * * [States that permit medical-marijuana use] from implementing their own laws that authorize the use, distribution, possession, or

cultivation of medical marijuana." Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, sec. 537, 131 Stat. at 228; see also Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, sec. 542, 129 Stat. at 2332-33 (2015); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, sec. 538, 128 Stat. at 2217 (2014). When interpreting such a rider, the Ninth Circuit said that DOJ prosecutions of individuals who complied with state medical-marijuana laws interfered with the implementation of such laws and were therefore impermissible. United States v. McIntosh, 833 F.3d 1163, 1177-78 (9th

Cir. 2016).[13] So, medical marijuana is illegal under federal law, but the statutes criminalizing it may not be enforced--at least not by the DOJ.

But the IRS is part of the Department of the Treasury, and marijuana sellers must still contend with the Code. Here their major problem is section 280E, which prevents any trade or business that "consists of trafficking in controlled substances" from deducting any business expenses. Congress enacted this section in 1982 as a response to our decision in <u>Edmondson v. Commissioner</u>, T.C. Memo. 1981-623, where we allowed a cocaine dealer to deduct the ordinary and necessary expenses of his illicit trade. <u>See</u> S. Rept. No. 97-494, at 309 (1982), 1982

---

[13] Note as well that these appropriations riders limit DOJ prosecutions of activity that would be legal under *medical*-marijuana laws. Thirty-three states now allow medical marijuana use: Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Utah, Vermont, Washington, and West Virginia. Nat'l Conference of State Legislatures, State Medical Marijuana Laws, Tbl. 1 (last updated Nov. 8, 2018), http://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx. So do the District of Columbia, Guam, and Puerto Rico. <u>Id.</u> Thirteen states permit medical use of some low-potency marijuana products: Alabama, Georgia, Iowa, Indiana, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, Texas, Virginia, Wisconsin, and Wyoming. <u>Id.</u> Tbl. 2.

Alaska, California, Colorado, Maine, Massachusetts, Michigan, Nevada, Oregon, Vermont, Washington, the District of Columbia, and the Northern Mariana Islands have repealed bans on recreational marijuana use. <u>Id.</u> Tbl. 1. No caselaw on how these appropriations riders will affect federal enforcement of federal law in these states has yet emerged.

U.S.C.C.A.N. 781, 1050. In 1986 new uniform capitalization (UNICAP) rules under section 263A raised the possibility that traffickers of controlled substances could capitalize indirect inventory costs that section 280E prevented them from deducting as expenses. See Tax Reform Act of 1986 (TRA), Pub. L. No. 99-514, sec. 803, 100 Stat. at 2350. But in 1988 Congress amended section 263A(a)(2) to say that taxpayers couldn't capitalize costs that were otherwise nondeductible. See Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. No. 100-647, sec. 1008(b)(1), 102 Stat. at 3437. It's within this confusing legal environment that Harborside operated.

Given this state of the law it's perhaps not surprising that Harborside isn't the first marijuana dispensary to appear in our Court. In our first major medical-marijuana case, we found that the taxpayer operated two separate trades or businesses--one that provided caregiving services and one that sold marijuana. CHAMP, 128 T.C. at 183-84. We therefore required the taxpayer to allocate its expenses between its two businesses according to the number of its employees and the portion of its facilities devoted to each. Id. at 185. We allowed it to deduct the expenses that it properly allocated to its caregiving business, but not those allocated to its marijuana-sales business. Id. at 173-74.

In our next medical-marijuana case, <u>Olive v. Commissioner</u>, 139 T.C. 19, 42 (2012), <u>aff'd</u>, 792 F.3d 1146 (9th Cir. 2015), we held that a dispensary that derived all its revenue from marijuana sales but also provided free activities and services to its patrons was but a single trade or business. Because that single trade or business was selling marijuana, we also held that section 280E precluded the deduction of any of the taxpayer's operating expenses, but did not prevent the taxpayer from adjusting for costs of goods sold, <u>id.</u> at 32-36, 38 n.19. And in <u>Canna Care, Inc. v. Commissioner</u>, T.C. Memo. 2015-206, at *12, <u>aff'd</u>, 694 F. App'x 570 (9th Cir. 2017), we found that the taxpayer--which stipulated that it was "in the business of distributing medical marijuana"--was engaged in one trade or business because its sale of nonmarijuana items such as books and socks "was an activity incident to its business of distributing medical marijuana." We therefore held that section 280E banned deductions for any of its business expenses. <u>Id.</u> at *13.

While Harborside raises some of the same issues we addressed in these cases, it also presents some new ones. Here we are asked to decide

- whether *res judicata* precludes the Commissioner from arguing Harborside was engaged in trafficking in a controlled substance;

- whether Harborside's business "consists of" trafficking in a controlled substance under section 280E;

•     whether Harborside has more than one trade or business;

•     what Harborside may include in its cost of goods sold; and

•     whether Harborside is liable for accuracy-related penalties.

We will take each in turn.

II.     Res Judicata

Harborside first argues that *res judicata* is a complete defense to its tax woes.  Its position is that these cases and the 2012 civil-forfeiture action are all based on the same claim--that Harborside was trafficking in a controlled substance.  It argues that the U.S. attorney's decision to dismiss the forfeiture action with prejudice means that as a matter of law Harborside was not a drug trafficker and cannot be subject to section 280E.

*Res judicata*--or claim preclusion--is an affirmative defense that bars suits on the same cause of action, and it does apply to tax litigation.  See Russell v. Commissioner, 678 F.2d 782, 785-86 (9th Cir. 1982); Koprowski v. Commissioner, 138 T.C. 54, 59-60 (2012).  The rule is easy to state:

> [W]hen a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

Commissioner v. Sunnen, 333 U.S. 591, 597 (1948) (quoting Cromwell v. County

of Sac, 94 U.S. 351, 352 (1876)).  To successfully assert a *res judicata* claim,

Harborside would have to clear these hurdles:

- an identity of claims between the actions;

- privity between the parties in the actions; and

- a final judgment on the merits in the civil-forfeiture action.

See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 322 F.3d

1064, 1077 (9th Cir. 2003).

We think Harborside smashes right into the first.  For there to be an identity

of claims, two cases must "arise out of the same transactional nucleus of facts."

Cent. Delta Water Agency v. United States, 306 F.3d 938, 952 (9th Cir. 2002)

(quoting Fund for Animals v. Lujan, 962 F.2d 1391, 1398 (9th Cir. 1992)).[14]  This

almost always means that *res judicata* applies only when the second claim could

have been asserted in the previous action.  See Tahoe-Sierra Pres. Council, 322

F.3d at 1078; Sawyer Tr. of May 1992 v. Commissioner, 133 T.C. 60, 77-78

---

[14] Other questions that affect a decision about whether two claims share a single identity are whether:  (1) "rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action;" (2) "substantially the same evidence is presented in the two actions;" and (3) "the two suits involve infringement of the same right."  Cent. Delta Water Agency, 306 F.3d at 952 n.11 (quoting Fund for Animals, 962 F.2d at 1398).

(2009). Harborside's cases here are about its tax deficiencies, and the parties agree that the government could not have brought such actions as part of the civil-forfeiture case in district court.

Harborside insists, however, this doesn't matter and points to United States v. Liquidators of European Fed. Credit Bank, 630 F.3d 1139 (9th Cir. 2011). In Liquidators, the Ninth Circuit explained that in most cases the answer to the question of whether two cases share the "same transactional nucleus of facts" will be synonymous with the question of whether the contested claim in the second case could have been brought in the first. Id. at 1151. But it found an exception when it looked closely at forfeiture actions, and it held that *res judicata* barred a later criminal-forfeiture claim against the same property that had been the object of an earlier civil-forfeiture case. Id. at 1151-52. It reasoned that the two types of forfeiture actions always seek exactly the same result, arise from exactly the same facts, and offer the government two paths to reach the same goal. Id. at 1152 (which might have led one to think that the doctrine to apply was "election of remedy" rather than *res judicata*). But whether one looks at this puzzle as one of election of remedy or *res judicata* doesn't matter here. The forfeiture action in district court sought just that--the forfeiture of the property leased by Harborside--whereas these cases seek to impose a civil tax liability. And while the two actions

share some of the same facts, they are not--unlike civil and criminal forfeiture-- different paths to the same goal. We will therefore decline to extend Liquidators beyond the "peculiarities of the forfeiture context." See United States v. Wanland, 830 F.3d 947, 957 (9th Cir. 2016). Instead we hold that these deficiency cases could not have been raised in the same case, and did not arise from the same transactional nucleus of fact. Identity of claims does not exist here and *res judicata* does not bar the Commissioner's deficiency actions. See Sawyer Tr., 133 T.C. at 78.

III.  Section 280E

The Code allows a business to deduct all of its "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Sec. 162(a). But it also has exceptions, one of which is section 280E. See Olive, 792 F.3d at 1148 (noting that sections 261 through 280H list "Items Not Deductible"). Section 280E states:

> No deduction or credit shall be allowed for any amount paid or incurred during the taxable year in carrying on any trade or business if such trade or business (or the activities which comprise such trade or business) *consists of* trafficking in controlled substances (within the meaning of schedule I and II of the Controlled Substances Act) which is prohibited by Federal law or the law of any State in which such trade or business is conducted. [Emphasis added.]

Medical marijuana is a Schedule I controlled substance, and dispensing it pursuant to the CCUA is "trafficking" within the meaning of section 280E.  See CHAMP, 128 T.C. at 182-83; Beck v. Commissioner, T.C. Memo. 2015-149, at *15.  But Harborside asks us to focus on the two words that we've italicized above:  What does it mean for a business to *consist of* trafficking?

Harborside argues that "consists of" means an exhaustive list--or in other words that section 280E applies only to businesses that *exclusively* or *solely* traffic in controlled substances and not to those that also engage in other activities.  The Commissioner argues that a single trade or business can have several activities and that section 280E applies to an entire trade or business if any one of its activities is trafficking in a controlled substance.  Both parties say their interpretations match other Code sections' use of "consists of" and best fit section 280E's purpose.

We've seen Harborside's argument before.  In Olive, 139 T.C. at 39, the taxpayer made a nearly identical argument, which we cursorily rejected.[15]  And, on appeal, the Ninth Circuit focused on the taxpayer's misuse of CHAMP.  See Olive, 792 F.3d at 1149-50.  We could stop there with a nod to *stare decisis*, but the parties argue the question at great length and, given the importance of these cases

---

[15] We note that this part of Harborside's brief repeats verbatim part of the taxpayer's brief in Olive.

to the industry, we will similarly explain our reasoning at greater length than we did when we first considered it.

## A. Statutory Interpretation

Harborside begins with an appeal to the "ordinary, everyday usage" of the phrase. And we do agree that Harborside is right about the meaning of "consists of" in everyday use: For example, one says "The AFC East *consists of* the Bills, Patriots, Jets, and Dolphins," and anyone fluent in English would understand that to mean that those are both all, and the only, teams in that division. Harborside also has some excellent secondary sources behind it on this point. See, e.g., Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 (2012) (contrasting "includes", which sets off a nonexhaustive list, with "consists of" or "comprises", each of which generally introduces an exhaustive list); Black's Law Dictionary 279 (5th ed. 1979) (explaining that "consisting" "is not synonymous with 'including'" because "including", when used in connection with a number of specified objects, always connotes incompleteness). This might seem as though it should be the end of our analysis--after all, "[t]he ordinary-meaning rule is the most fundamental semantic rule of interpretation." Scalia & Garner, supra, at 69.

Another fundamental canon of construction, however, tells us to prefer textually permissible readings that don't render a statute ineffective.[16] Id. at 63 (citing Citizens Bank of Bryan v. First State Bank, 580 S.W.2d 344, 348 (Tex. 1979) ("[I]f the language is susceptible of two constructions, one of which will carry out and the other defeat * * * [the statute's] object, it should receive the former construction.")).  Following the most common usage of "consists of," as Harborside suggests, would indeed make section 280E ineffective.  If that section denies deductions only to businesses that *exclusively* traffic in controlled substances, then any street-level drug dealer could circumvent it by selling a single item that wasn't a controlled substance--like a pack of gum, or even drug paraphernalia such as a hypodermic needle or a glass pipe.  This reading would edge us close to absurdity, which is another result our reading of a statute should avoid if possible.  See id. at 234-35.

One might imagine--as a strictly theoretical matter--that a legislature might enact an absurdity, and our job as judges would be to enforce it.  But the Commissioner reminds us that we shouldn't do so if there is an effective-and-not-absurd meaning that is also permissible.  We must both avoid "a sterile literalism

---

[16] When canons of construction compete with one another, we must decide which is most appropriate under the circumstances.  See Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Texts 59 (2012).

which loses sight of the forest for the trees" and maintain "a proper scruple against imputing meanings for which the words give no warrant." N.Y. Tr. Co. v. Commissioner, 68 F.2d 19, 20 (2d Cir. 1933) (L. Hand, J.), aff'd sub nom. Helvering v. N.Y. Tr. Co., 292 U.S. 455 (1934); see also Scalia & Garner, supra, at 356.

But can "consists of" ever introduce a nonexhaustive list?

### 1. Dictionaries

Harborside says "no", and urges us to take a hint from the fourth edition of the American Heritage Dictionary. Harborside quotes a usage note in the entry for "include". See American Heritage Dictionary 887 (4th ed. 2006). The note explains that "include" connotes, but does not necessarily mean, that a list immediately following it is incomplete. Id. It also suggests that authors introducing exhaustive lists use "comprise" or "consist of" instead. Id. It doesn't say, however, that "consists of" necessarily introduces an exhaustive list. See id. And the dictionary's definition of "consist" is "[t]o be made up of or composed," "[t]o have a basis; reside or lie," or "[t]o be compatible." Id. at 392.

Harborside's other dictionary citation is similarly ambiguous. An old edition of Black's Law Dictionary defines "consisting" as "[b]eing composed or

made up of." Black's Law Dictionary 279 (5th ed. 1979).[17] It also explains that "consisting" is not synonymous with "including" because "including" always connotes incompleteness, and "consisting" doesn't. Id. The entry doesn't say that "consisting" and "including" are antonyms; that is, although "consisting" doesn't connote an incomplete list, it also doesn't connote an exhaustive list. Id. And even if "consisting" were the antonym of "including", that would mean only that it *connotes* completeness--not that it necessarily *means* completeness. Harborside doesn't mention it, but the same dictionary also defines "consist" as "[t]o stand together, to be composed of or made up of." Id.

Harborside even points us to an odd opinion that cites a precursor of the Oxford English Dictionary[18] that says "'[c]onsisting of' can have the meaning of 'to have its essential character in' or 'foundation in.'" Madison Teachers, Inc. v. Madison Metro. Sch. Dist., 541 N.W.2d 786, 801 (Wis. Ct. App. 1995) (Sundby, J., concurring in part and dissenting in part) (citing IIC A New English Dictionary

---

[17] The seventh, eighth, and ninth editions of Black's Law Dictionary don't define "consisting" at all. See Black's Law Dictionary 303 (7th ed. 1999); Black's Law Dictionary 327 (8th ed. 2004); Black's Law Dictionary 350 (9th ed. 2009). The tenth edition defines "consisting of," but only for the specialized purposes of patent law. Black's Law Dictionary 373 (10th ed. 2014).

[18] See OED, History of the OED, http://public.oed.com/history-of-the-oed/ (last visited Nov. 2, 2018).

on Historical Principles 861-62 (1893)).[19]  The takeaway here is that none of the

dictionary definitions that Harborside provides preclude reading "consists of" as

setting off a nonexhaustive list.

> 2.    The Code

But this is a tax case, and before we go too far afield in dictionaries or

literature, we should draw back to other sections of the law we have to apply to

these cases.  See, e.g., United States v. Olympic Radio & Television, Inc., 349

U.S. 232, 236 (1955) (interpreting phrase consistently within Code chapter and

saying courts should give Code "as great an internal symmetry and consistency as

its words permit").  But see Util. Air Regulatory Grp. v. EPA, 573 U.S. __, __,

134 S. Ct. 2427, 2441 (2014) ("the presumption of consistent usage 'readily

yields' to context" (quoting Environmental Defense v. Duke Energy Corp., 549

U.S. 561, 574 (2007))).  What does the Code itself tell us about how to read

"consists of"?

---

[19] See, e.g.,William Shakespeare, The Merchant of Venice act 3, sc. 3 ("The duke cannot deny the course of law: / For the commodity that strangers have / With us in Venice, if it be denied, / Will much impeach the justice of his state; / Since that the trade and profit of the city / Consisteth of all nations" -- Venice being open to foreign trade, or depending on foreign trade, but not literally trading with every nation in the world.)

There are some similar phrases. Section 401(a)(22) says that if more than 10% of the assets in an employee's defined-contribution plan account are stock in his closely held employer, section 409(e)'s voting-rights rules don't apply so long as "the trade or business of such employer consists of publishing on a regular basis a newspaper for general circulation." Section 451(i)(3)(B) provides an optional rule for determining in what year income is realized for "any stock or partnership interest in a corporation or partnership * * * whose principal trade or business consists of providing electric transmission services." And section 513(h)(1)(B) excludes from the definition of unrelated trade or business "any trade or business which consists of" exchanging or renting donor and member lists among nonprofits. We haven't found any cases construing what "consists of" means in any of these sections.

Harborside points out that in many Code sections Congress used the phrase "consists of" but then modified it--as it did in the electricity-related section above --to clarify that it doesn't mean "is composed entirely of." See, e.g., sec. 581 ("a substantial part of the business of which consists of"); sec. 181(e)(2)(E) (added by the Consolidated Appropriations Act, 2016, sec. 169(c), 129 Stat. at 3067 ("includes or consists of")). Harborside suggests that Congress could have similarly modified "consists of" in section 280E if it had intended to set off a

nonexhaustive list there. The Commissioner, on the other hand, points to several Code sections where Congress used the phrase "consists of" but then modified it to clarify that it meant "is composed entirely of." See, e.g., sec. 444(d)(3)(B) ("consists only of"); sec. 416(g)(4)(H) ("consists solely of"). He suggests that Congress would have done the same for section 280E if it had meant to indicate an exhaustive list there.

Unmodified uses of "consists of" do sometimes seem to introduce exhaustive lists. See, e.g., sec. 108(e)(4)(B) ("family of an individual consists of the individual's spouse, the individual's children, grandchildren, and parents, and any spouse of the individual's children or grandchildren"). But in other places "consists of" would lead to an absurd result if it indicated an exhaustive list. The Commissioner points us to a glaring example: A "computer" eligible for accelerated depreciation "*consists of* a central processing unit containing extensive storage, logic, arithmetic, and control capabilities." Sec. 168(i)(2)(B)(ii)(II) (emphasis added). Here, Harborside's reading of "consists of" would mean that anything other than a central processing unit isn't a computer. Surely something wouldn't fail to be a computer because it had a monitor, a keyboard, a mouse, or a power cord. See Dunford v. Commissioner, T.C. Memo. 2013-189, at *30-*31 (referring to a laptop as a "computer" when determining depreciation eligibility).

These examples show, we think, that the Code uses "consists of" in more than one way. It sometimes sets off an exhaustive list, but it also sometimes introduces a nonexclusive list.

3.    Caselaw

That leaves us with caselaw. Each party has precedent here, too. Harborside's chief example is one from Wisconsin which held that a statute preventing "a collective bargaining unit consisting of school district professional employees" from arbitrating certain issues didn't preclude arbitration by a unit that mainly had such employees but also had some other types of employees. Madison Teachers, Inc., 541 N.W.2d at 790-91, 793-94. That court said that a "decent respect for language makes it impossible to read 'consisting of' in the inclusive sense." Id. at 794. But it also explained that none of the 482 occurrences of the phrase "consisting of" in Wisconsin's statutes introduced nonexhaustive lists, and it pointed out that the Wisconsin legislature was careful to modify that phrase whenever it meant to use it inclusively. Id. Apparently Wisconsin's code enjoys a consistency missing from the Internal Revenue Code, which as we've seen uses "consists of" multiple ways. It's therefore hard for us--despite what we hope is our decent respect for language--to do as Harborside asks and interpret the phrase as mechanically as the Wisconsin Court of Appeals has.

The Commissioner, for his part, points us to a case that dealt with a section of the Code itself--a statute excluding for tax purposes from a tax-exempt organization's unrelated trade or business "any trade or business which consists of conducting bingo games." Julius M. Israel Lodge of B'nai B'rith No. 2113 v. Commissioner, T.C. Memo. 1995-439, 1995 WL 544877, at *3, aff'd, 98 F.3d 190 (5th Cir. 1996); see also sec. 513(f). But that case holds that "instant bingo" isn't "bingo" for section 513(f); it doesn't explicitly address what it means to "consist[] of conducting bingo games." See Julius M. Israel Lodge, 1995 WL 544877, at *7 (although it implicitly suggests the same entity can have two businesses in that situation, much as we did in CHAMP). It's therefore of limited use here. Caselaw doesn't settle the meaning of "consists of" any better than the Code itself does.

Dictionaries, the Code, and caselaw all show that "consists of" can introduce either an exhaustive list or a nonexhaustive list.[20] A nonexhaustive list

---

[20] The Code is in good company. Shakespeare appears to use "consists of" both ways in a single exchange:

Sir Toby Belch: * * * Does not our life consist of the four elements?

Sir Andrew Aguecheek: Faith, so they say; but I think it rather consists of eating and drinking.

Sir Toby Belch: Thou'rt a scholar; let us therefore eat and drink.

(continued...)

is the only option that doesn't render section 280E ineffective and absurd. We therefore read section 280E to deny business-expense deductions to any trade or business that involves trafficking in controlled substances, even if that trade or business also engages in other activities.

B.    Purpose

We also note that Harborside has a subtler argument about the play between literal meaning and statutory purpose. It reminds us that dispensaries that are legal under state law didn't exist in 1982 and Congress even today won't let the DOJ prosecute them as if they were street-corner drug dealers. See Consolidated Appropriations Act, 2017 sec. 537; Consolidated Appropriations Act, 2016 sec. 542; Consolidated and Further Continuing Appropriations Act, 2015 sec. 538; see also McIntosh, 833 F.3d at 1177. These arguments aren't new, either--the Ninth Circuit disposed of them in Olive, 792 F.3d at 1150-51, so we mostly reiterate its reasoning here to acknowledge that Harborside has preserved it.

Although section 280E predates states' legalization of medical marijuana, "[t]hat Congress might not have imagined what some states would do in future years has no bearing on our analysis. It is common for statutes to apply to new

---

[20](...continued)
William Shakespeare, Twelfth Night act 2, sc. 3. The four elements are an exhaustive list, but eating and drinking aren't all of life, even for Sir Andrew.

situations. And here, application of the statute is clear." Id. at 1150. The restriction on how the DOJ uses funds is irrelevant here because "the government is enforcing only a tax, which does not prevent people from using, distributing, possessing, or cultivating marijuana in California. Enforcing these laws might make it more costly to run a dispensary, but it does not change whether these activities are *authorized* in the state." Id. at 1150.

Finally, we note that several members of Congress asked the IRS to issue guidance saying that medical-marijuana dispensaries aren't subject to section 280E, and the IRS said it couldn't do that unless Congress amended the Code or the Controlled Substances Act. See IRS Information Letter 2011-0005. Members of Congress have subsequently introduced several bills that would exempt state-legal marijuana businesses from section 280E. Small Business Tax Equity Act of 2011, H.R. 1985, 112th Cong. (2011); Small Business Tax Equity Act of 2013, H.R. 2240, 113th Cong. (2013); Small Business Tax Equity Act of 2015, H.R. 1855, 114th Cong. (2015); Small Business Tax Equity Act of 2015, S. 987, 114th Cong. (2015); Small Business Tax Equity Act of 2017, H.R. 1810, 115th Cong. (2017); Small Business Tax Equity Act of 2017, S. 777, 115th Cong. (2017); Responsibly Addressing the Marijuana Policy Gap Act of 2017, H.R. 1824, 115th

Cong. (2017); Responsibly Addressing the Marijuana Policy Gap Act of 2017, S. 780, 115th Cong. (2017).  None has been enacted.

We hold that section 280E prevents Harborside from deducting its business expenses.

IV.    More Than One Trade or Business?

Harborside says that even if section 280E applies to its marijuana sales, it can still deduct its expenses for any separate, nontrafficking trades or businesses. That's correct.  See CHAMP, 128 T.C. at 184-85; see also Olive, 792 F.3d at 1149.  We therefore need to determine which--if any--of Harborside's activities are separate trades or businesses.

An activity is a trade or business if the taxpayer does it continuously and regularly with the intent of making a profit.  See, e.g., Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); United States v. Am. Bar Endowment, 477 U.S. 105, 110 n.1 (1986).  A single taxpayer can have more than one trade or business, CHAMP, 128 T.C. at 183, or multiple activities that nevertheless are only a single trade or business, see, e.g., Davis v. Commissioner, 29 T.C. 878, 891 (1958).  Even separate entities' activities can be a single trade or business if they're part of a "unified business enterprise" with a single profit motive.  Morton v. United States, 98 Fed. Cl. 596, 600 (2011).

Whether two activities are two trades or businesses or only one is a question of fact. See, e.g., CHAMP, 128 T.C. at 183; Owens v. Commissioner, T.C. Memo. 2017-157, at *21. To answer it, we primarily consider the "degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together * * *, and the similarity of the various undertakings." Olive, 139 T.C. at 41; sec. 1.183-1(d), Income Tax Regs.

We've considered this issue with other California medical-marijuana dispensaries. In CHAMP, 128 T.C. at 175, 183, we found that the taxpayer had two distinct trades or businesses--caregiving services and medical-marijuana sales--even though its customers paid a single fee that entitled them to unlimited access to the services and a fixed amount of marijuana. We noted there that seven of the taxpayer's employees distributed marijuana, eighteen employees provided caregiving services, and no employees did both. Id. at 185. Moreover, dispensing marijuana occurred in only 10% of one of the taxpayer's three facilities. Id. at 176. We found the taxpayer's primary purpose was to provide caregiving services, and that those services were both "substantially different" from and "stood on * * * [their] own, separate and apart" from dispensing marijuana. Id. at 183.

In Olive, however, we held (and the Ninth Circuit agreed) that a taxpayer who sold medical marijuana and provided complimentary services--including movies, board games, yoga classes, massages, snacks, personal counseling, and advice on how to best consume marijuana--had a single trade or business. Olive, 139 T.C. at 38-42; Olive, 792 F.3d at 1148-50. The taxpayer in Olive charged only for marijuana, and set a price based on the amount and type of marijuana its patients bought; the cost of the other services was bundled into that price. Olive, 139 T.C. at 42; 792 F.3d at 1149. The same employees who sold marijuana also provided the services, and the taxpayer paid no additional wages, rent, or other significant costs connected exclusively with those services. Olive, 139 T.C. at 41. The taxpayer also had a single bookkeeper and accountant. Id. at 42. These facts led us to find that the services were "incident to" the sale of marijuana, and we noted that the two activities had a "close and inseparable organizational and economic relationship." Id. at 41. We held that they were "one and the same business." Id.

The most recent case where we had to figure out the number of a marijuana dispensary's trades or businesses is Canna Care, Inc. Like Harborside, the taxpayer there sold medical marijuana and other items, including books, T-shirts, and hats. Canna Care, Inc., at *4, *12. Unlike the taxpayer in Olive, the taxpayer

in <u>Canna Care, Inc.</u> had at least a little bit of income from nonmarijuana sales. <u>Id.</u> at *12. But we still found only a single trade or business--selling marijuana--and "the sale of any other item was an activity incident to" those sales. <u>Id.</u> But our analysis there was constrained: The parties had stipulated that the taxpayer "was in the business of distributing medical marijuana" and the record didn't enable us to determine what percentage of the taxpayer's income came from marijuana sales and what percentage came from other sources. <u>See id.</u>; <u>see also</u> <u>Alterman v. Commissioner</u>, T.C. Memo. 2018-83, at *27-*28 (refusing to allow business-expense deductions where the taxpayers failed to identify specific payments, provide record citations, or propose findings of fact sufficient for us to distinguish expenses associated with the sale of marijuana from those associated with the sale of nonmarijuana merchandise).

Harborside presented its case in greater detail. It argues that it had four activities, each of which was a separate trade or business:

- sales of marijuana and products containing marijuana;

- sales of products with no marijuana;

- therapeutic services; and

- brand development.

We consider each.

A.    Selling Marijuana and Products Containing Marijuana

There's no question that selling marijuana and products containing marijuana was Harborside's primary purpose.  Sixty percent of the members Harborside's security checked in were there to buy marijuana in one form or another.  Marijuana and marijuana products took up around 75% of Harborside's sales floor.  Harborside's employees spent 80-90% of their time purchasing, processing, and selling these products.  And those sales generated at least 98.7% of Harborside's revenue during each of the years at issue.  This was certainly a trade or business--specifically, the trade or business of trafficking in a controlled substance.  See Olive, 139 T.C. at 38; CHAMP, 128 T.C. at 182-83.

B.    Selling Products That Didn't Contain Marijuana

Harborside's sale of items that didn't contain marijuana--such as branded clothing, hemp bags, books about marijuana, and marijuana paraphernalia such as rolling papers, pipes, and lighters--generated the remaining 0.5% of its revenue. The same Harborside employees who bought, processed, and sold marijuana also sold these items, but selling them took up only 5-10% of their time.  The nonmarijuana items occupied only 25% of the sales floor where Harborside sold marijuana, and that sales floor was accessible only to patrons who had already presented their credentials to security--which means that no one who couldn't buy

marijuana could buy these nonmarijuana items. And the record shows no separate entity, management, books, or capital for the nonmarijuana sales. This leads us to find that the sale of non-marijuana-containing products had a "close and inseparable organizational and economic relationship" with, and was "incident to," Harborside's primary business of selling marijuana. See Olive, 139 T.C. at 41; see also Tobin v. Commissioner, T.C. Memo. 1999-328, 1999 WL 773964, at *5-*6 (farm and garden one activity because same employees, equipment, management, and books). There's also an obvious business purpose for selling items that facilitate and encourage marijuana use alongside actual marijuana. We also find that the sale of items that are about marijuana, are branded with Harborside's logo, or enable use of marijuana is not "substantially different" from the sale of marijuana itself. See CHAMP, 128 T.C. at 183.

Harborside nevertheless argues that its sale of anything other than marijuana is a separate trade or business. It cites an analogy the Ninth Circuit used in Olive, 792 F.3d at 1150, to explain why a store that charged for marijuana and gave away incidental services had only a single trade or business. In that analogy, a hypothetical bookstore that sold books and gave away coffee to attract customers ("Bookstore A") had only one trade or business, whereas a hypothetical bookstore

that sold books and also sold coffee ("Bookstore B") had two trades or businesses. Id.

We think Harborside misses the analogy's point: It shows that a service a taxpayer doesn't charge for, but which attracts customers, isn't a separate trade or business. It doesn't mean that selling two things is necessarily two separate trades or businesses. Bookstore B is there to provide contrast to Bookstore A, which is what the court compared to the taxpayer in Olive. Id.

Finally, the analogy--though a good fit for Olive, which was selling marijuana and giving away snacks and soft drinks--doesn't suit Harborside. A better analogy would be to a bookstore that derives 0.5% of its revenue from selling stationery, bookmarks, and T-shirts with pictures of books on them ("Bookstore C"). To be completely analogous to Harborside, Bookstore C would sell these items using the same employees, sales floor, management, ledgers, and business entity it used to sell books. That hypothetical bookstore would, we think, be a single trade or business under the Ninth Circuit's reasoning. And Harborside's sale of non-marijuana-containing items is, we find, not a separate trade or business.

C.    Therapeutic Services

Recognizing that an activity needs a profit motive to be a separate trade or business, Harborside argues that a portion of each marijuana sale was actually a purchase of its free holistic services.[21]  This is what it told its patrons, too.

Harborside says this makes it like CHAMP.  But in CHAMP, 128 T.C. at 175-76, members paid a set fee for unlimited access to extensive services and also received a fixed amount of marijuana--the services' price wasn't "bundled" into the amount paid for marijuana, to use Harborside's terminology.  And we found that the services in CHAMP were the taxpayer's primary purpose, took up most of its employees' time, and used almost all of its three facilities.  Id. at 174-76, 183, 185.

Harborside is more like the dispensary in Olive, 792 F.3d at 1148, where patrons paid according to the amount and type of marijuana they wanted and in return gained access to incidental services.  Harborside tries to distinguish itself by pointing out that it offered many more services than the much smaller taxpayer in Olive did.[22]  But the services were still incidental; Harborside's security spent only

---

[21] Harborside argues that "the price for these services was rolled into the price of the cannabis."

[22] In Olive, 792 F.3d at 1148, the taxpayer's combined reported income and
(continued...)

5% of its time checking in people for the services, while spending 60% of its time checking in people who were there to buy marijuana. And independent contractors, rather than Harborside's own employees, provided those services. During the years at issue Harborside paid those contractors a total of only about $680,000--less than 1% of its sales revenue from marijuana.

The relationship between Harborside's marijuana business and holistic services closely fits Olive's "Bookstore A" analogy. See id. at 1150. Just as a bookstore that gives away coffee is still only a bookstore, a marijuana dispensary that gives away services is still only a marijuana dispensary. See id. The fact that Harborside used a tiny bit of its marijuana-sales revenue to pay for those services doesn't change anything--after all, Bookstore A necessarily pays for its coffee with book sales. And we also find that there were business reasons to offer these services alongside marijuana sales: It justified premium pricing and helped Harborside meet the community-benefit standards California law required. We therefore find that Harborside's holistic services were not a separate trade or business.

---

[22](...continued)
claimed expenses for each year we considered were under $500,000. In contrast, Harborside had $5 million-$25 million in total revenue during each of the years at issue.

D.    Branding

Harborside's final argument on this subject is that its brand-development activity was a separate trade or business. Because this did not generate any revenue until after the years at issue, the Commissioner compares it to preoperational expenditures that have to be capitalized instead of deducted. Harborside insists it is a trade or business eligible for section 162 deductions because from day 1 it performed them with an independent profit motive. To show a profit motive without any revenue, Harborside says its branding activities were part of a "unified business enterprise" with its activities that did make money during the years at issue.

A separate entity purposely operating at a loss is still a trade or business eligible for deductions if it and entities related to it together form a unified business enterprise that itself has a profit motive. See Campbell v. Commissioner, 868 F.2d 833, 836-37 (6th Cir. 1989) (partnership leasing airplane to sister corporation at loss had profit motive because common owners benefited), aff'g in part, rev'g in part T.C. Memo. 1986-569; Kuhn v. Commissioner, T.C. Memo. 1992-460, 1992 WL 193604, at *5 (partnership's below-market lease of land to sister corporation had profit motive because corporation benefited); Morton, 98 Fed. Cl. at 602 (S corporation that owned airplane was part of unified business

enterprise with shareholder's other businesses and therefore had a profit motive). In other words, the unified-business-enterprise doctrine Harborside relies on says that separate but related entities can share a single profit motive; it doesn't say that a single entity's unprofitable activities are a separate trade or business. Rather than show that Harborside's branding was separate from its marijuana sales, the unified-business-enterprise doctrine instead suggests that it was part of a single overall trade or business.

There's also no actual evidence to suggest that Harborside's brand development was in any way a separate trade or business. As far as we can tell, Harborside did its branding using the same entity, management, capital structure, employees, and facilities as its marijuana sales. See Tobin, 1999 WL 773964, at *5-*6. And rather than being "substantially different" from the underlying sale of marijuana, Harborside's brand development was necessarily entwined with it. See CHAMP, 128 T.C. at 183. Harborside's branding, therefore, had a "close and inseparable organizational and economic relationship" with, and was "one and the same business" as, its marijuana sales. See Olive, 139 T.C. at 41. It was not a separate trade or business.

Harborside dedicated the lion's share of its resources to selling marijuana and marijuana products. Those sales accounted for over 99.5% of its revenue. Its

other activities were neither economically separate nor substantially different. We therefore hold that Harborside had a single trade or business--the sale of marijuana. That's trafficking in a controlled substance under federal law, so Harborside cannot deduct any of its related expenses. See sec. 280E; see also Olive, 139 T.C. at 38; CHAMP, 128 T.C. at 182-83.

V.    Cost of Goods Sold

The fact that Harborside can't deduct any of its business expenses doesn't mean it owes tax on its gross receipts. All taxpayers--even drug traffickers--pay tax only on gross income, which is gross receipts minus the cost of goods sold (COGS). See, e.g., New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); CHAMP, 128 T.C. at 178 n.4; secs. 1.61-3(a), 1.162-1(a), Income Tax Regs. Congress understood that when it enacted section 280E. See S. Rept. No. 97-494, supra at 309, 1982 U.S.C.C.A.N. at 1050. We've understood it ourselves. See Olive, 139 T.C. at 32-36.

But what is the distinction between a business-expense deduction and an adjustment for COGS? Deductions are subtractions from gross income that taxpayers make when they calculate their taxable income. Sec. 63(a). Deductions are statutory, and Congress can grant or deny them as it chooses--the standard refrain is that they're a matter of Congress's "legislative grace." INDOPCO, Inc.

v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co., 292 U.S. at 440; Olive, 139 T.C. at 32. We've already seen an example of Congress's withholding that grace from those whose works it rejects--it grants most taxpayers a deduction for ordinary and necessary business expenses in section 162, but then uses section 280E to deny those deductions to drug traffickers. See Canna Care, Inc., at *7.

COGS is the costs of acquiring inventory, through either purchase or production. See, e.g., Reading v. Commissioner, 70 T.C. 730, 733 (1978) (COGS is "expenditures necessary to acquire, construct or extract a physical product which is to be sold"), aff'd, 614 F.2d 159 (8th Cir. 1980); secs. 1.61-3(a), 1.162-1(a), Income Tax Regs. As we've said, all taxpayers, regardless of the business they're in, use COGS to offset their gross receipts when they calculate gross income. See, e.g., Olive, 139 T.C. at 20 n.2.

The big difference between deductions and COGS adjustments is timing. See INDOPCO, 503 U.S. at 83-84; Wasco Real Props. I, LLC v. Commissioner, T.C. Memo. 2016-224, at *19. Taxpayers can usually claim at least part of a deductible expense for the year they incur it. See, e.g., INDOPCO, 503 U.S. at 83-84; Wasco Real Properties I, LLC, at *19. But when accounting for COGS they have to capitalize an item's cost in the year of acquisition or production and either amortize it or wait until the year the item's sold to make the corresponding

adjustment to gross income.[23]  See, e.g., INDOPCO, 503 U.S. at 83-84; Wasco

Real Props. I, LLC, at *19.

A.    How Should Harborside Account for its COGS?

The Code tells taxpayers what to include in COGS.  See, e.g., secs. 263,

263A, 471.  But there's more than one set of rules, and the issue here is which set

applies to Harborside.  The Commissioner thinks Harborside needs to follow the

rules under section 471, but Harborside insists it's subject to the rules of section

263A.  We consider each.

1.    Section 471

Section 471 was in place when Congress enacted section 280E.  It

empowers the Commissioner to write regulations that govern how taxpayers

account for inventories.  See sec. 471.  This the Commissioner did--with separate

regulations for resellers and producers.  See secs. 1.471-3(b) and (c), 1.471-11,

Income Tax Regs.

---

[23] A simple example illustrates the difference.  If in year 1 a taxpayer incurs a deductible expense of $100, he can reduce his taxable income for year 1 by $100.  If in year 1 he instead buys 100 units of inventory for $100 and manages to sell 10 of those units per year, he has to take a $10 COGS adjustment in year 1, a $10 adjustment in year 2, and so on, through year 10, when he runs out of inventory.  In each case, the taxpayer reduces the amount of income he's taxed on by a total of $100.  The difference is that he recovers the entire deductible expense in year 1, but recovers his inventory cost as he sells the inventory, which in this example means he doesn't get the full $100 back until year 10.

The regulations tell resellers to use as their COGS the price they pay for inventory plus any "transportation or other necessary charges incurred in acquiring possession of the goods." Sec. 1.471-3(b), Income Tax Regs. The regulations for producers are more complex. Producers must include in COGS both the direct and indirect costs of creating their inventory. See secs. 1.471-3(c), 1.471-11, Income Tax Regs. The regulations tell producers to capitalize the "cost of raw materials," "expenditures for direct labor," and "indirect production costs incident to and necessary for the production of the particular article, including * * * an appropriate portion of management expenses." Sec. 1.471-3(c), Income Tax Regs. Direct and indirect production costs are further explained in section 1.471-11(b), Income Tax Regs.

In their current forms, section 471 and its regulations also direct taxpayers to section 263A for additional rules.

2.     Section 263A

Congress enacted section 263A in 1986. TRA sec. 803. That section instructs both producers and resellers to include "indirect" inventory costs in their COGS. Sec. 263A(a)(2)(B), (b); sec. 1.263A-1(a)(3), (c)(1), (e), Income Tax Regs. It also broadens the definition of indirect costs for both types of taxpayers. Compare sec. 1.263A-1(e)(3), Income Tax Regs., with sec. 1.471-11, Income Tax

Regs. Congress thought this would treat taxpayers more fairly. S. Rept. No. 99-313, at 140 (1986), 1986-3 C.B. (Vol. 3) 1, 140. It also thought this would do a better job of matching COGS adjustments to the years in which taxpayers realized the related income. Id.; see also Office of the Sec'y, Dep't of the Treasury, 1 Tax Reform for Fairness, Simplicity, and Economic Growth: Treasury Department Report to the President 126-28 (1984).

These sections are also about timing. A business that could immediately deduct indirect costs under section 471 now has to treat those costs as capital expenditures and wait until it realizes related income to adjust for them. In a sense Congress is taking away some current deductions but allowing them in later years, renamed COGS. It is legislative grace deferred, but not denied.

Most business don't like this. They'd rather have a deduction now than increased COGS later. See, e.g., Frontier Custom Builders, Inc. v. Commissioner, T.C. Memo. 2013-231, at *14 (homebuilder argued it was a seller, not a producer, in attempt to avoid capitalization), aff'd, 626 F. App'x 89 (5th Cir. 2015). But drug traffickers have a different attitude. Although section 280E prevents them from deducting expenses, they are still entitled to COGS adjustments. Olive, 139 T.C. at 32-36. By renaming COGS what had been deductions, Congress made it possible for traffickers to adjust for expenses that they couldn't previously claim.

They have to make those adjustments in the later year when the inventory is sold, but later is better than never.

Except that maybe it's still never. In 1988 Congress amended section 263A(a)(2), adding flush language that says: "Any cost which (but for this subsection) could not be taken into account in computing taxable income for any taxable year shall not be treated as a cost described in this paragraph." TAMRA sec. 1008(b)(1). The regulations show that "cost" here means expenses that would otherwise be deductible. See sec. 1.263A-1(c)(2), Income Tax Regs. In their explanation of how section 263A(a)(2)'s flush language works, the regulations point out that if a business meal is entirely attributable to the acquisition or production of inventory, the taxpayer capitalizes only 80% of it because section 274(n), at that time, limited business meal deductions to 80% of their "cost" (which the section itself calls an "expense", see sec. 274(n)); the taxpayer doesn't get to capitalize the whole meal and escape the 80% limitation on the deduction, sec. 1.263A-1(c)(2)(i), Income Tax Regs. So if something wasn't deductible before Congress enacted section 263A, taxpayers cannot use that section to capitalize it. Section 263A makes taxpayers defer the benefit of what used to be deductions--it doesn't shower that as grace on those previously damned.

3.    Harborside's Argument

Can Congress get away with this?  Harborside argues that limiting its COGS to "only the actual cost used to purchase inventory" violates the Sixteenth Amendment.  Its theory is that section 263A represents the most accurate tax-accounting method for calculating COGS and that not letting marijuana dispensaries use it forces them to pay tax on more than their gross income.  In other words, Harborside thinks section 263A somehow defines COGS for constitutional purposes.

That's wrong.  The Sixteenth Amendment's meaning didn't change when Congress enacted section 263A.  See U.S. Const. art. V (providing only method for changing constitution).  Section 471 wasn't found unconstitutional during the many decades when it was the only means of calculating COGS, and it wouldn't be unconstitutional now if Congress repealed section 263A.  The Constitution does limit Congress to taxing only gross income, and courts have consistently held--including in cases Harborside cites--that gross income is gross receipts minus *direct* costs.  See Reading, 70 T.C. at 733 (COGS are direct investment in item sold); Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707, 715 (1956) (gross income on sales is income for Sixteenth Amendment); Anderson Oldsmobile, Inc. v. Hofferbert, 102 F. Supp. 902, 905 (D. Md. 1952) (IRS can tax only amount

realized on sale minus basis), aff'd, 197 F.2d 504 (4th Cir. 1952). Harborside, like all taxpayers, can still adjust for its direct costs--or, to use its terminology, "the actual cost used to purchase inventory." It therefore pays tax only on the amount it realizes on sales, which is what the Constitution requires.

Harborside compares itself to the taxpayer in Anderson Oldsmobile, but that case doesn't help it. There the taxpayer paid more for its inventory than since-repealed federal price controls allowed, and the Commissioner tried to limit the taxpayer's COGS to the highest legal price. Id. at 903. The court held that because Congress can tax only gross income, the taxpayer was entitled to a COGS adjustment for the actual amount it paid for its inventory even though that amount was illegally high. Id. at 903, 905, 909.

As Harborside correctly points out, Anderson Oldsmobile says that statutes can't let the Commissioner tax more than gross income. Id. at 905. But that's not what's happening here. Unlike Anderson Oldsmobile, where the Commissioner wanted to use a statute to deny the taxpayer a COGS adjustment for part of its direct cost of purchasing inventory, these cases find the Commissioner saying only that Harborside can't use section 263A to capitalize indirect costs that it wouldn't otherwise be able to deduct. Harborside still gets to do exactly what the taxpayer

in <u>Anderson Oldsmobile</u> did: calculate its gross income by subtracting the direct cost of its inventory from its gross receipts. <u>See</u> <u>id.</u> at 905.

What <u>Anderson Oldsmobile</u> really holds is that taxpayers can adjust for COGS whether or not their direct costs are legal. <u>See</u> <u>id.</u> at 903; <u>see also</u> <u>Pittsburgh Milk Co.</u>, 26 T.C. at 717 (taxpayer who sold milk below legal price used actual price when calculating income). This tells us what we already know: Harborside would get COGS adjustments for its direct inventory costs no matter what--even if it was trafficking cocaine or any other controlled substance not legal under California law. The only things Harborside doesn't get are indirect inventory costs granted as deductions and then deferred under section 263A.

The section 263A capitalization rules don't apply to drug traffickers. Unlike most businesses, drug traffickers can't capitalize indirect expenses beyond what's listed in the section 471 regulations. Section 263A expressly prohibits capitalizing expenses that wouldn't otherwise be deductible, and drug traffickers don't get deductions. Because federal law labels Harborside a drug trafficker, it must calculate its COGS according to section 471.

B.    Is Harborside a Producer or a Reseller?

Because the section 471 regulations have different rules for resellers and producers, how Harborside calculates its COGS depends on which type of

taxpayer it is. Harborside was without question a reseller of the marijuana edibles and non-marijuana-containing products it bought from third parties and sold at its facility. But the situation is more complex for the marijuana bud it sold. Harborside insists it produced this marijuana and can include in its COGS the indirect inventory costs that section 1.471-3(c), Income Tax Regs., describes. The Commissioner says Harborside is a reseller and, under section 1.471-3(b), Income Tax Regs., it can include only its inventory price and transportation costs.

        1.        <u>What Does "Produce" Mean?</u>

To sort this out we first need to know what "produce" means. The Commissioner, citing a Court of Claims case, says that under section 471 "production" means "manufacturing". <u>See</u> <u>Heaven Hill Distilleries, Inc. v. United States</u>, 476 F.2d 1327, 1335 (Ct. Cl. 1973). He then cites a line of cases saying that "manufacturing" requires a change to the essential character of the merchandise. <u>Marcor, Inc. v. Commissioner</u>, 89 T.C. 181, 193 (1987); <u>see also</u> <u>Anheuser-Busch Brewing Ass'n v. United States</u>, 207 U.S. 556, 562 (1908); <u>In re I. Rheinstrom & Sons Co.</u>, 207 F. 119 (E.D. Ky. 1913), <u>aff'd sub nom.</u> <u>Cent. Tr. Co. v. George Lueders & Co.</u>, 221 F. 829 (6th Cir. 1915); <u>People ex rel. New England Dressed Meat & Wool Co. v. Roberts</u>, 155 N.Y. 408, 412 (1898); <u>People v. Knickerbocker Ice Co.</u>, 1 N.E. 669 (N.Y. 1885). His argument, then, is that

"production" means "change". Look at the dates of most of these cases, though-- they predate the Sixteenth Amendment.

Harborside at least points us to something more recent, the Ninth Circuit case, Suzy's Zoo v. Commissioner, 273 F.3d 875 (9th Cir. 2001), aff'g 114 T.C. 1 (2000). That case, however, isn't about section 471. It's about section 263A(g)(1)'s definition of "produce"--which says that term "includes construct, build, install, manufacture, develop, or improve"--and section 1.263A-2(a)(1)(i), Income Tax Regs., which says that "produce includes the following: construct, build, install, manufacture, develop, improve, create, raise, or *grow*." Suzy's Zoo, 273 F.3d at 878 (emphasis added).

Although Suzy's Zoo is about section 263A, it's useful for construing section 471's regulations which, like section 263A's regulations, provide different methods of accounting for inventory that's "purchased" or "produced" but don't define those terms. See sec. 1.471-3(b) and (c), Income Tax Regs. We think "produce" should mean the same thing in section 471 as it does in section 263A. We also think we should follow the Ninth Circuit's reasoning in a case appealable to that court. See Golsen, 54 T.C. at 757.

In Suzy's Zoo, the taxpayer, a greeting-card company, designed images and sent them to a contract printer who did color separations, made proofs, and printed

them using its own materials. A trucking company then picked up the prints and took them to a finisher. The finisher cut and folded the prints into greeting cards and returned them to the taxpayer. The printer and the finisher each bore the risk of loss while they had the materials. Suzy's Zoo, 273 F.3d at 877.

We held--and the Ninth Circuit affirmed--that the taxpayer was a "producer" because it retained title to the items throughout the contract-production process. Id. at 877, 880. Citing regulations under section 263A, the court said: "The only requirement for being a 'producer' * * * is that the taxpayer be 'considered an owner of the property produced,'" that "ownership is 'based on all of the facts and circumstances,'" and that "[a] taxpayer may be considered an owner of property produced, even though the taxpayer does not have legal title to the property." Id. at 880 (citing section 1.263A-2(a)(1)(ii)(A), Income Tax Regs.). A taxpayer can be a "producer", moreover, even if it uses contract manufacturers to do the actual production. Id. at 878 (citing section 263A(g)(2)). The Ninth Circuit explained that achieving section 263A's purpose of treating all taxpayers fairly required a broad construction of "produce". Id. at 879; see also Von-Lusk v. Commissioner, 104 T.C. 207, 215 (1995); S. Rept. No. 99-313, supra at 140, 1986-3 C.B. (Vol. 3) at 140. We've said this before ourselves, not coincidentally in a case holding that

"production" for section 263A doesn't require a physical change. See Von-Lusk, 104 T.C. at 217.

"Produce" is therefore broader than "manufacture". That's also evident from the Code and regulations. We saw that already in section 263A(g)(1) and section 1.263A-2(a)(1)(i), Income Tax Regs. See supra pp. 58-59. The section 471 regulations also show that "production" and "manufacturing" are distinct, if related, concepts. Section 1.471-11, Income Tax Regs., discusses "production" costs, but refers in several places to costs "incident to and necessary for production or manufacturing," a construction implying that the two terms are not identical, even if they are closely related and receive identical tax treatment.[24] For purposes of section 471, production turns on ownership--ownership as determined by facts and circumstances, not formal title.

## 2. Did Harborside Own What Its Growers Grew?

In finding that Suzy's Zoo was a producer, the Ninth Circuit emphasized the "degree of control * * * [the taxpayer] exercise[d] over the manufacturing

---

[24] The heading of section 1.471-11, Income Tax Regs., is "Inventories of Manufacturers," but this doesn't change our analysis of its text. Statutory titles and headings are useful when interpreting ambiguous words or phrases, but "they cannot undo or limit that which the text makes plain." Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co., 331 U.S. 519, 528-29 (1947); see also Dixon v. Commissioner, 132 T.C. 55, 81 (2009).

process." Suzy's Zoo, 273 F.3d at 880. Harborside says it also exercised a high degree of control over the growers it purchased marijuana from. It points out that it bought marijuana only from its members, and even then only if the members used Harborside's clones (which they either bought or received for free), took Harborside's growing class, followed Harborside's best practices, and met Harborside's quality-control standards.

But there was more to Suzy's Zoo. There the taxpayer acquired ownership when it first designed the characters because that was the most important step and the one that required the most skill and expertise. Suzy's Zoo, 114 T.C. at 8. Suzy's Zoo's contractors couldn't sell, copy, or use those characters without breaching Suzy's Zoo's license. Id. Suzy's Zoo retained the "exclusive right to sell the finished product," id. at 9, and it accepted all the finished products it ordered, see Suzy's Zoo, 273 F.3d at 877.

Harborside, unlike Suzy's Zoo, see id.; Suzy's Zoo, 114 T.C. at 8-10, didn't create the clones, maintain tight control over them, order specific quantities, prevent sales to third parties, or take possession of everything produced. Harborside bought clones from nurseries and either sold them to growers with no strings attached or gave clones to growers expecting that they'd sell bud back to Harborside. Nothing prevented either type of grower from selling to another

collective, and DeAngelo thought it would be futile to try to use the courts to stop

them.[25]  Harborside had complete discretion over whether to purchase what bud

growers brought in, paid growers only if it purchased their bud, and at times

rejected the "vast majority" of its growers' bud.  And Harborside thought growers

could do whatever they wanted with the rejected bud.

This was not the type of contract-manufacturing arrangement we saw in

Suzy's Zoo, 273 F.3d at 877, where a designer hired others to make its products

but owned those products at all stages of their creation.  Harborside merely sold or

gave members clones that it had purchased from nurseries and bought back bud if

and when it wanted.  In between these two steps it had no ownership interest in the

marijuana plants.  Harborside is therefore a reseller for purposes of section 471

and must adjust for its COGS according to section 1.471-3(b), Income Tax Regs.[26]

This leaves only the issue of whether Harborside owes accuracy-related

penalties under section 6662(a).  We will address this issue in a separate opinion.

---

[25] DeAngelo said he never sued anyone for breach of contract because "the possibility o[f] prevailing on contract disputes in something that involves a controlled substance is slim and would be expensive."

[26] Harborside did have a "processing room."  See supra p. 8.  But the "processing" that went on there--reinspection, packaging, and labeling--fall within the category of "purchasing, handling, and storage" that resellers do without losing their character as resellers.  See sec. 1.263A-3(c), Income Tax Regs.